******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JANE DOE *v.* CHARLES COCHRAN
## (SC 19879)

Palmer, McDonald, Robinson, D'Auria, Mullins,
Kahn and Vertefeuille, Js.*

*Syllabus*

The plaintiff sought to recover damages from the defendant physician, claiming that he was negligent in failing to accurately report the positive results of a laboratory test for genital herpes to his patient, S, the plaintiff's boyfriend. The plaintiff and S had been involved in an exclusive romantic relationship. Before the relationship became sexual, the plaintiff and S agreed to seek testing for sexually transmitted diseases (STDs). Prior to this agreement, the plaintiff had tested negative for STDs. S then visited the defendant and informed him that he wanted to be tested for STDs for the protection of his new, exclusive girlfriend. The defendant arranged for S to undergo a blood test, and the results were positive for genital herpes. The defendant delegated to a member of his practice staff the task of informing S of the test results. The staff member incorrectly told S over the phone that his STD test results were negative. After the plaintiff's relationship with S became sexual, the plaintiff began to experience outbreaks consistent with and was subsequently diagnosed with genital herpes. S thereafter contacted the defendant to inquire further, and the defendant informed S that he actually had tested positive for genital herpes and apologized for the error. The defendant moved to strike the plaintiff's complaint, claiming that the plaintiff's claim sounded in medical malpractice and, therefore, must fail for lack of a physician-patient relationship between the plaintiff and the defendant. The defendant claimed alternatively that, even if the plaintiff's claim sounded in ordinary negligence, the plaintiff and the defendant were not involved in any special relationship that would justify extending a duty of care to her. The trial court granted the defendant's motion to strike, concluding that the defendant did not owe a duty to the plaintiff. On appeal from the judgment in favor of the defendant, *held*:

1. The defendant could not prevail on his claim, as an alternative ground for affirming the trial court's judgment, that, because the plaintiff's complaint sounded in medical malpractice, the lack of a physician-patient relationship rendered her claim legally insufficient and, therefore, that the trial court properly struck the plaintiff's complaint; although this court assumed, for the sake of argument, that the plaintiff's complaint reasonably could be read to allege that the defendant committed medical malpractice, it concluded that the plaintiff's allegations also reasonably could be understood to sound in ordinary negligence because, even though the alleged error occurred in a medical setting and arose as a result of a medical diagnosis in the context of an ongoing physician-patient relationship, that error was not one involving professional medical judgment or skill, as the reading of the test results and the communication of those results to S were ministerial tasks that required no advanced medical training, and proof that the alleged error constituted negligence would not require expert medical testimony or the establishment of a professional standard of care.

2. A health care provider who negligently misinforms a patient, either directly or through a designated staff member, that the patient tested negative for an STD such as genital herpes owes a duty of care to an identifiable third party who is engaged in an exclusive romantic relationship with the patient at the time of the STD testing and who foreseeably contracts the STD as a result of his or her reliance on the provider's erroneous communication to the patient, and, accordingly, the trial court incorrectly concluded that, as a matter of law, the defendant owed no duty of care to the plaintiff with respect to the inaccurate reporting to S of his test results: although this court previously has demonstrated a general aversion to extending a physician's duty of care to nonpatients, it has allowed, under limited circumstances, for the imposition of liability in cases, such as the present one, involving an identifiable potential victim who will be foreseeably harmed by a physician's negligence, and constru-

ing the plaintiff's complaint in the light most favorable to sustaining its sufficiency, this court concluded that the plaintiff was an identifiable potential victim of the defendant's alleged negligence, as only one person could have fit the description of S's exclusive girlfriend, and S presumably could have identified her by name if he had been asked by the defendant to do so; moreover, a number of other jurisdictions have recognized that a duty of a medical professional to correctly advise a patient who suffers from a communicable disease, including STDs, extends not only to the patient but also to third parties who may foreseeably contract the disease from the patient, and § 311 of the Restatement (Second) of Torts, which provides that one who negligently gives false information may be held liable to a third party who predictably is injured by the recipient's reasonable reliance on that information, appeared to support the imposition of liability in this case; furthermore, public policy considerations supported the imposition of a third-party duty of care under the circumstances of the present case, as imposing a duty in this case, in which broader public health concerns are involved, would not necessarily intrude on the sanctity of the physician-patient relationship, when the duty at issue simply requires a physician to accurately relay test results to the patient himself, if the defendant could not be held liable, then the plaintiff in all likelihood would be without remedy or compensation for her injuries and errors such as the defendant's miscommunication would go unadmonished, the defendant, rather than the plaintiff or S, was most effectively and economically situated to avoid the harm that befell the plaintiff, and such errors are not so prevalent or ineluctable that imposing third-party liability, solely with respect to identifiable victims, would meaningfully impact medical malpractice insurance rates or overall health care costs.

(*Three justices dissenting in one opinion*)

Argued November 16, 2017—officially released July 16, 2019

*Procedural History*

Action to recover damages for personal injuries sustained as a result of the defendant's alleged negligence, and other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Povodator, J.*, granted the defendant's motion to strike; thereafter, the court granted the defendant's motion for judgment and rendered judgment thereon, from which the plaintiff appealed. *Reversed*; *further proceedings*.

*Thomas B. Noonan*, for the appellant (plaintiff).

*James S. Newfield*, with whom, on the brief, was *Diana M. Carlino*, for the appellee (defendant).

*Gregory J. Pepe* filed a brief for the American Medical Association et al. as amici curiae.

*Jennifer L. Cox* and *Jennifer A. Osowiecki* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Emily B. Rock*, *Cynthia C. Bott* and *Julie V. Pinette* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

PALMER, J. The principal issue in this appeal is whether a physician who mistakenly informs a patient that he does not have a sexually transmitted disease (STD) may be held liable in ordinary negligence to the patient's exclusive sexual partner for her resulting injuries when the physician knows that the patient sought testing and treatment for the express benefit of that partner. Under the circumstances alleged, we conclude that the defendant, Charles Cochran, a physician, owed a duty of care to the plaintiff, identified by the pseudonym Jane Doe, even though she was not his patient. Accordingly, we conclude that the trial court improperly granted the defendant's motion to strike the plaintiff's one count complaint and reverse the judgment of the trial court.

The following facts, as set forth in the plaintiff's complaint and construed in the manner most favorable to sustaining its legal sufficiency; see, e.g., *Lestorti* v. *DeLeo*, 298 Conn. 466, 472, 4 A.3d 269 (2010); and procedural history are relevant to our disposition of this appeal. In early 2013, the plaintiff began dating her boyfriend, identified in this action by the pseudonym John Smith. At all relevant times, the plaintiff and Smith were involved in an exclusive romantic relationship. At some point, the couple agreed that, before their relationship became sexual, they would individually seek testing for STDs. As of July, 2013, the plaintiff had tested negative for and did not have any STDs.

At that time, pursuant to his agreement with the plaintiff, Smith visited his physician, the defendant, who is a licensed medical doctor practicing in Norwalk. During Smith's visit, the defendant asked Smith why he wanted to be tested again for STDs, as the defendant had tested him just five months earlier. Smith explained that he wanted to be tested again for the protection and benefit of his new, exclusive girlfriend, the plaintiff. The defendant then took a sample of Smith's blood, arranged for it to be tested for STDs, and subsequently reviewed the laboratory (lab) test results.

The lab report that the defendant reviewed included a guide for reading the test's results. The guide indicated that an HSV 2 IgG (herpes simplex virus type 2 specific antibody) result of less than 0.9 is negative for the herpes simplex virus type 2 (herpes), a result between 0.9 and 1.1 is equivocal, and a result greater than 1.1 means that the sample tested positive for herpes. Smith's HSV 2 IgG test result was 4.43, significantly above the threshold for a positive herpes diagnosis.

The defendant delegated to a member of his staff the task of informing Smith of the results of his test. Even though the lab report clearly demonstrated a positive herpes diagnosis, the staff member incorrectly told Smith over the phone that his STD test results had come

back negative.

The plaintiff's relationship with Smith subsequently became sexual. Thereafter, the plaintiff began to experience herpes outbreaks and was diagnosed with herpes. Upon learning of this, Smith contacted the defendant to inquire further about his test results. The defendant then informed Smith that he actually had tested positive for herpes and apologized for the error.

The plaintiff brought a one count action against the defendant, alleging that the defendant had been negligent in various respects. The defendant moved to strike the complaint on the basis that the plaintiff's claim sounded in medical malpractice and, therefore, must fail for lack of any physician-patient relationship between the plaintiff and the defendant. The defendant argued in the alternative that, even if the court construed the plaintiff's claim as sounding in ordinary negligence, the plaintiff and the defendant were not involved in any special relationship that would justify extending a duty of care to her.

The trial court granted the defendant's motion to strike. The court did not expressly resolve the issue of whether the plaintiff's claim sounds in ordinary negligence or medical malpractice, at once describing the plaintiff as "seeking to extend medical malpractice liability of a physician to the sexual partner of a patient" and referring to the defendant's "claimed negligence . . . in reporting the test results." The analysis undertaken by the trial court, however, implies that it viewed the claim as sounding in ordinary negligence. Specifically, the court concluded that the claim was governed by our decision in *Jarmie* v. *Troncale*, 306 Conn. 578, 50 A.3d 802 (2012), and applied the framework that we set out in that case for determining whether a nonpatient may assert an ordinary negligence claim against a health care provider. See id., 591–99. Ultimately, the trial court concluded the defendant did not owe a duty of care to the plaintiff and, for that reason, granted the defendant's motion to strike. This appeal followed.[1]

I

As an initial matter, we must resolve a dispute between the parties as to the gravamen of the plaintiff's complaint. As an alternative ground for affirmance, the defendant contends on appeal, as he did before the trial court, that the plaintiff's one count complaint sounds in medical malpractice. In support of this conclusion, the defendant points to, among other things, the facts that (1) the plaintiff alleged that "[the defendant] had an obligation to perform the STD tests and [to] report the results accurately to . . . Smith according to accepted medical practice and standards," (2) the plaintiff further alleged that the defendant's "breach of accepted medical practice and standards" by failing to properly treat, test, monitor, and advise Smith, was the

cause of her injuries, and (3) the plaintiff's counsel attached to the complaint a certificate, pursuant to General Statutes § 52-190a (a), averring that there were grounds for a good faith belief that the defendant had committed "medical negligence" in the "care or treatment" of Smith. Because a medical malpractice claim that fails to allege a physician-patient relationship between a plaintiff and a defendant is legally insufficient; *Jarmie* v. *Troncale*, supra, 306 Conn. 588–89; and because it is undisputed that the plaintiff never was a patient of the defendant, the defendant contends that the trial court properly struck the complaint.

The plaintiff responds that, although she attached a certificate of good faith pursuant to § 52-190a (a) out of an abundance of caution, her complaint alleges ordinary, common-law negligence rather than medical malpractice. She notes that the single count complaint is titled simply "negligence," and it alleges that the plaintiff's "injuries were the result of the negligence and carelessness of the [defendant] . . . in [that he failed] to properly advise . . . Smith of his STD test results . . . ." At no point, moreover, does the complaint use the term "medical malpractice."

A

We begin our analysis by reiterating that, although the better practice may be to include a separate count of the complaint for each distinct theory of liability, there is no such requirement. Practice Book § 10-26 provides that, "[w]here separate and distinct causes of action, as distinguished from separate and distinct claims for relief founded on the same cause of action or transaction, are joined, the statement of the second shall be prefaced by the words Second Count, and so on for the others . . . ." (Emphasis omitted.) In construing an earlier version of this rule of practice, this court explained that it has "uniformly approved the use of a single count to set forth the basis of a plaintiff's claims for relief [when] they grow out of a single occurrence or transaction or closely related occurrences or transactions, and it does not matter that the claims for relief do not have the same legal basis. It is only when the causes of action, that is, the groups of facts [on] which the plaintiff bases his claims for relief, are separate and distinct that separate counts are necessary or indeed ordinarily desirable." (Footnote omitted.) *Veits* v. *Hartford*, 134 Conn. 428, 438–39, 58 A.2d 389 (1948). That remains the rule in this state, and it has been applied with respect to a single count complaint alleging different theories of negligence. See *Wheeler* v. *Beachcroft, LLC*, 320 Conn. 146, 160, 129 A.3d 677 (2016) ("[e]ven though a single group of facts may give rise to rights for several different kinds of relief, it is still a single cause of action" [internal quotation marks omitted]); *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 588, 542 A.2d 1124 (1988) (restating rule as articulated in

*Veits*); *Baldwin* v. *Jablecki*, 52 Conn. App. 379, 382, 726 A.2d 1164 (1999) (statutory and common-law negligence may be pleaded in single count). Indeed, in *Jarmie*, on which both parties rely, we treated the single count complaint as alleging both medical malpractice and common-law negligence when the pleadings were substantially similar to those at issue here. See *Jarmie* v. *Troncale*, supra, 306 Conn. 583–86; cf. *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 463, 102 A.3d 32 (2014) (reference to violation of statutory duty did not transform count of complaint alleging common-law negligence into statutory claim).[2]

Accordingly, we may assume, for the sake of argument, that the defendant is correct that the complaint reasonably can be read to allege that he committed professional malpractice by failing to follow accepted medical standards in his advising, treatment, and ongoing testing and monitoring of Smith. The question that we must resolve is simply whether the complaint also alleges that the defendant committed ordinary common-law negligence by permitting or instructing his office staff to give Smith the wrong test results.[3]

B

The following well established principles guide our analysis. First, "[b]ecause a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling . . . is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 398, 142 A.3d 227 (2016).

"In Connecticut, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory [on] which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted

in such a way so as to strain the bounds of rational comprehension." (Citation omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 268 Conn. 463, 466 n.4, 845 A.2d 389 (2004).

Second, our courts have long recognized that a health care provider may commit ordinary negligence, as opposed to medical malpractice, in the course of treating a patient or providing medical services. See, e.g., *Multari* v. *Yale-New Haven Hospital, Inc.*, 145 Conn. App. 253, 260, 75 A.3d 733 (2013) ("The plaintiff has not alleged medical malpractice . . . but simply ordinary negligence against an entity that happens to be a medical provider. The fact that the defendant is a medical provider, does not, by itself, preclude a finding that the plaintiff's action sounds in ordinary negligence."); *Badrigian* v. *Elmcrest Psychiatric Institute, Inc.*, 6 Conn. App. 383, 385–86, 505 A.2d 741 (1986) (claim that defendant failed to supervise psychiatric patients in crossing highway sounded in ordinary negligence); see also *Jarmie* v. *Troncale*, supra, 306 Conn. 593 and n.5 (leaving open possibility of third-party negligence claims against health care providers).

To determine whether a claim against a health care provider sounds in ordinary negligence rather than (or in addition to) medical malpractice, we must "review closely the circumstances under which the alleged negligence occurred. [P]rofessional negligence or malpractice . . . [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . [M]alpractice presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254, 811 A.2d 1266 (2002). "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) Id., 254–55. Accordingly, a claim sounds in medical malpractice when "(1) the defendants are sued in their capacities as medical professionals, (2) the alleged negligence is of a specialized medical nature that arises out of the medical professional-patient relationship, and (3) the alleged negligence is substantially related to medical diagnosis or treatment and involved the exercise of medical judgment." (Internal quotation marks omitted.) Id., 254. In connection with an ordinary negligence claim, by contrast, the defendant's conduct

is judged against the standard of "what a reasonable person would have done under the circumstances . . . ." *Considine* v. *Waterbury*, 279 Conn. 830, 859, 905 A.2d 70 (2006).

C

With these principles in mind, we consider the plaintiff's complaint. The relevant allegations of the complaint indicate that the defendant reviewed Smith's test results, notified a staff member of those results, and delegated to the staff member the task of informing Smith of the results. The complaint further alleges that the lab report contained a guide that made clear that Smith had tested positive for herpes. In addition, the complaint alleges that, although the test results were positive, the staff member informed Smith that his results were negative. Finally, the plaintiff alleges that the defendant's negligence in failing to accurately advise Smith of his positive test results caused Smith to infect the plaintiff with herpes.

These allegations are consistent with two distinct theories of negligence. First, the defendant could have misread Smith's lab report and incorrectly concluded that the results were negative. Second, it is possible that the defendant interpreted the report correctly but that either the defendant misinformed his staff member that the results were negative or the staff member misinformed Smith. In other words, the alleged error could have occurred either in the initial interpretation of the report or in the inaccurate communication of the results, via the staff member, to Smith. See 2 Restatement (Second), Torts § 311 (2), p. 106 (1965) (negligence may consist of failure to exercise reasonable care in ascertaining accuracy of information or in manner in which information is communicated).

In either case, we agree with the plaintiff that her allegations reasonably can be understood to sound in ordinary negligence. It is true that the alleged error transpired in a medical setting and that it arose as a result of a medical diagnosis in the context of an ongoing physician-patient relationship. There are at least two reasons, however, why we nevertheless conclude that this aspect of the complaint need not be read to sound in medical malpractice.

First, the alleged error is not one involving professional medical judgment or skill. If the defendant misread Smith's lab result, then he failed to perform what was, in essence, a simple, ministerial task. The index to the report states that a result greater than 1.1 indicates a positive test, and the report states that Smith's result was 4.43. No advanced medical training was necessary to determine that Smith had tested positive for herpes; elementary reading and arithmetic skills should have been sufficient. Indeed, laypeople routinely perform comparable tasks, such as reading and interpreting

meat thermometers, oil dipsticks, pool and spa test strips, and insulin tests.

Of course, the same conclusion holds to an even greater extent if the genesis of the error was that the defendant simply told his staff member the wrong test result or the staff member relayed the wrong result to Smith. That sort of careless miscommunication could occur in any setting and has nothing to do with the exercise of professional medical judgment or skill. Indeed, the very fact that the defendant delegated the task to a staff member, who presumably was not a medical doctor, points to the nontechnical nature of the communication.

Second, regardless of whether the alleged error arose from a misreading or a miscommunication, proving that it constituted negligence would not require expert medical testimony or the establishment of a professional standard of care. A jury will not need expert testimony to determine whether the defendant's staff was negligent in leading Smith to believe that he was free of STDs when the defendant knew, or should have known, that Smith had tested positive for herpes, a contagious STD, and intended to engage in sexual activity. Such a determination is well within the ken of a lay person.[4]

Accordingly, we conclude that, as in *Jarmie*, the plaintiff in this case pleaded a cause of action sounding in ordinary negligence. We therefore turn our attention to the plaintiff's claim that the defendant, in informing Smith of his test results, owed a common-law duty of care not only to Smith but also to the plaintiff, a non-patient.

II

Having concluded that the plaintiff's claim sounds in ordinary negligence, we now must determine whether, under the circumstances presented in this case, a physician owes a duty of care to an identifiable third party[5] who is not a patient. We conclude that a physician does owe such a duty.

A

We begin by setting forth the elements of a cause of action in ordinary negligence. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and then, if one is found, it is necessary to evaluate the scope of that duty. . . . The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the [alleged tortfeasor] violated that duty in the particular situation at hand." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 589.

"Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury [that] resulted was foreseeable, but the test is, would the ordinary [person] in the [alleged tortfeasor's] position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result . . . .

"A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy [that] lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) Id., 590.

The default assumption of the common law, then, is that one owes a duty to exercise due care in one's affirmative conduct with respect to all people, insofar as one's negligent actions may foreseeably harm them. 3 F. Harper et al., Harper, James and Gray on Torts (3d Ed. 2007) § 18.6, p. 862. Under specific circumstances, however, the law, for reasons of public policy, places additional restrictions on the class of people to whom a duty of care is owed. See, e.g., id., § 18.3, p. 781. In most instances, for example, a physician's liability for the negligent care and treatment of a patient does not extend to nonpatient third parties who have been foreseeably injured by that negligence. Id., § 18.5A, p. 852; see also *Jarmie* v. *Troncale*, supra, 306 Conn. 592–93. But see *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 568, 113 A.3d 932 (2015) (recognizing limited cause of action for bystander emotional distress resulting from medical malpractice); *Jarmie* v. *Troncale*, supra, 593 n.5 (declining to endorse per se rule barring third-party claims against health care providers). The present case requires us to further clarify the scope of this exception to the general duty rule.

B

With these principles in mind, we now turn our attention to the central question posed by the present appeal, namely, whether a health care provider who negligently

misinforms a patient that he does not have an STD owes a duty of care to an identifiable third party who foreseeably[6] contracts the STD as a result of the provider's negligence. The defendant contends that various public policy considerations counsel against recognition of such a duty. Most notably, because a patient such as Smith could have been or become intimate with an unlimited number of romantic partners, there is no meaningful way to identify or restrict the number of individuals whom he might infect and, therefore, to limit the class of persons who could have standing to bring an action of this sort.

The defendant further contends that a number of public policy considerations and common-law traditions that are unique to the health care environment or, specifically, to the physician-patient relationship, counsel against recognizing a physician's duty to a nonpatient third party under the circumstances alleged in the present case. He argues that (1) the law generally does not impose on physicians a duty of care to nonpatient third parties, (2) the considerations underlying the adoption of Connecticut's medical malpractice statutes, General Statutes §§ 52-190a through 52-190c, disfavor the imposition of additional liability on physicians, (3) imposing on physicians duties to third parties risks interfering with and undermining the physician-patient relationship, and (4) considerations of confidentiality create both legal and logistical hurdles to the recognition of such duties. Finally, the defendant contends that the plaintiff could have taken various measures both to protect herself from contracting herpes—presumably sexual abstention or the use of prophylactics—and to establish proper standing to bring an action of this sort—such as accompanying Smith when he sought treatment from the defendant.

The trial court, in granting the defendant's motion to strike, was swayed by a number of these arguments. The court also discussed several additional concerns: whether physicians might become obligated to contact and warn or to educate patients' sexual partners; the fact that physicians have no control over whether and how patients share their STD test results with potential sexual partners; and whether the recognition of a duty to nonpatients should be predicated on the existence of a formal, mutual STD testing agreement between the patient and his or her prospective sexual partner. Although the defendant, certain of the amici,[7] and the trial court raise many valid concerns, for the reasons that follow, we are persuaded that they do not counsel against the recognition of a duty under the specific circumstances presented in this case.

1

Setting aside for the moment the question of what third-party duties apply within the distinct confines of the physician-patient relationship, we observe at the

outset that many of the concerns that the defendant raises and that the trial court found persuasive have been addressed and resolved in other professional contexts. Although the plaintiff has not labeled it as such, her claim is, in essence, one for negligent misrepresentation. That tort specifically encompasses situations such as this, in which a tortfeasor negligently supplies misinformation knowing that the recipient of that information intends to supply it in turn for the benefit and guidance of a third party.

"This court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. . . . [When the information supplied is to be used in the furtherance of a business transaction and the alleged harm is solely pecuniary, the] governing principles are set forth in . . . § 552 of [Volume 3 of] the Restatement Second of Torts [1977]: One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance [on] the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Citations omitted; internal quotation marks omitted.) *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 217–18, 520 A.2d 217 (1987). Recognizing the potentially limitless scope of the financial harms that may flow from the dissemination of false information, the Restatement (Second) restricts liability for negligent misrepresentation of this sort to the loss suffered "(a) by the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it," and "(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." 3 Restatement (Second), Torts § 552 (2) (a) and (b), p. 127 (1977); see also id., comment (a), pp. 127–28. In other words, the Restatement (Second) addresses the problem of potentially limitless third-party liability, first, by conferring standing on only those third parties to whom the defendant knew that the recipient intended to supply the information at issue and, second, by restricting liability to losses arising from transactions for the purpose of which the information was supplied.

Defined and cabined in this manner, liability for negligent misinformation has been upheld in various contexts in which a professional is hired to supply information to a client, knowing that the client is obtaining the information at least in part for the benefit and guidance of some third party or parties. Although we have not definitively resolved whether an accountant or an

auditor may be liable for negligent misrepresentation to a nonclient third party; see *Stuart* v. *Freiberg*, 316 Conn. 809, 816–17, 831–32 n.17, 116 A.3d 1195 (2015) (deeming it unnecessary to determine whether liability could be imposed and leaving question open); a number of other courts have held that such professionals can be held liable under the approach set forth in § 552 of the Restatement (Second) of Torts. See, e.g., *Ellis* v. *Grant Thornton LLP*, 530 F.3d 280, 288–89 (4th Cir.) (applying West Virginia law), cert. denied, 555 U.S. 1049, 129 S. Ct. 652, 172 L. Ed. 2d 614 (2008); *North American Specialty Ins. Co.* v. *Lapalme*, 258 F.3d 35, 38–40 (1st Cir. 2001) (applying Massachusetts law); see also *Tricontinental Industries, Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 836 (7th Cir. 2007) (applying similar Illinois rule).

A growing number of courts also have dispensed with the traditional privity requirement and have imposed liability on attorneys with respect to transactions in which the attorney's opinion is solicited for the benefit of an identifiable third party. See generally B. Walker, Note, "Attorney's Liability to Third Parties for Malpractice: The Growing Acceptance of Liability in the Absence of Privity," 21 Washburn L.J. 48 (1981) (noting modern trend toward imposing liability and discussing cases). Although courts following the modern approach to professional negligent misinformation claims have not been oblivious to the concerns raised by the defendant and certain of the amici—the potential for limitless third-party liability, interference with the professional-client relationship, and the undue burdening of the professional practice—they have concluded that limiting liability to circumstances in which professional services are sought for the specific benefit of *identifiable* third parties adequately addresses any concerns centering around both foreseeability and professionalism. See id., 65–66; see also *North American Specialty Ins. Co.* v. *Lapalme*, supra, 258 F.3d 40; *Pelham* v. *Griesheimer*, 92 Ill. 2d 13, 20–21, 440 N.E.2d 96 (1982).[8]

Moreover, as we discuss more fully in part II B 4 of this opinion, the Restatement (Second) of Torts recognized that there is even less need to cabin potential third-party liability for negligent misrepresentation in cases such as this, in which the misinformation was not supplied for the recipient's financial benefit and the third-party plaintiff suffered physical as well as pecuniary injuries. Under those circumstances, the Restatement (Second) advises that "[o]ne who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results . . . (b) to such third persons as the actor should expect to be put in peril by the action taken." 2 Restatement (Second), supra, § 311 (1) (b), p. 106. Similar principles underlie § 324A, which provides that "[o]ne who undertakes . . . to render services to

another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or . . . (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Id., § 324A (a) and (c), p. 142.

2

Turning to the specific question of what duties, if any, a medical professional owes to a nonpatient third party, we begin by reviewing Connecticut precedent. The parties agree that *Jarmie* v. *Troncale*, supra, 306 Conn. 578, is the seminal Connecticut case on the subject, but they disagree as to how the present case should be resolved under *Jarmie*.[9] We conclude that, although *Jarmie* helps to guide our analysis, whether a physician owes a duty of care to a patient's intimate partner to accurately report that patient's STD test results remains a question of first impression in Connecticut.

In *Jarmie*, the defendant physician diagnosed and treated a patient for various liver and kidney ailments, including hepatic encephalopathy but failed to warn her of the latent driving impairment associated with her condition. Id., 581. After leaving the physician's office, the patient lost consciousness while operating her motor vehicle and struck the plaintiff. Id. The trial court granted the defendant's motion to strike the plaintiff's complaint in his subsequent negligence action against the physician, concluding that physicians owe no common-law duty to protect third parties from injuries caused by patients. Id., 582.

On appeal, we began by emphasizing that there is no common-law or statutory rule against nonpatients bringing ordinary negligence claims against physicians. Id., 586. We recognized, however, that our cases display a general aversion to extending a physician's duty of care to nonpatients. See id., 592. That aversion is rooted in the principles of tort reform underlying § 52-190a, as well as the common-law rule that, in the absence of a special relationship, there is no duty to protect a third person from the conduct of another. Id. We further explained that "[t]here is no well established common-law rule that a physician owes a duty to warn or advise a patient for the benefit of another person." Id. Nevertheless, we emphasized that we have not "employed or endorsed a per se rule that [third-party] claims [against health care providers] are categorically barred because of the absence of a physician-patient relationship but, rather . . . this court has exercised restraint when presented with opportunities to extend the duty of health care providers to persons who are not their patients." (Internal quotation marks omitted.) Id., 593–94 n.5. In addition, we distinguished cases from other jurisdic-

tions that had imposed third-party liability on a physician by remarking that those cases, unlike *Jarmie*, involved a physician who had "failed to warn the patient that he or she either had a communicable disease or had been exposed to one." Id., 616. Accordingly, we left open the possibility that, under appropriate circumstances, and in particular with respect to the diagnosis of communicable diseases, a physician's common-law duty of care may extend to nonpatients.[10]

In the parts of this opinion that follow, we will discuss and apply the various factors and considerations that we deemed to be relevant to the duty analysis in *Jarmie*. For now, we emphasize two points. First, a principal reason that we affirmed the judgment of the trial court in *Jarmie* and declined to recognize that the defendant physician owed a duty to the plaintiff motorist was because the plaintiff was not an *identifiable* victim at the time that medical services were provided. Id., 590–91, 603. Rather, "potential victims of [the physician's] alleged negligence included any random pedestrian, driver, vehicular passenger or other person who happened to come in close proximity to a motor vehicle operated by [the patient] following her diagnosis." Id., 597.

We explained that, in previous cases, we had "limited foreseeable victims of a health care provider's negligence to identifiable persons . . . ." Id., 594; see id., 596 ("the foreseeability test as applied by this court in the context of health care providers has . . . required an identifiable victim because we have deemed the effect of a physician's conduct on third parties as too attenuated"); see also *Jacoby* v. *Brinckerhoff*, 250 Conn. 86, 96–97, 735 A.2d 347 (1999) (psychiatrist owed no duty to patient's ex-spouse, who was not identifiable victim); *Fraser* v. *United States*, 236 Conn. 625, 632, 674 A.2d 811 (1996) (psychotherapist owed no duty to victim because "our decisions defining negligence do not impose a duty to those who are not identifiable victims [and] . . . in related areas of our common law, we have concluded that there is no duty except to identifiable persons").

In the present case, by contrast, the plaintiff has alleged that "Smith told [the defendant] that he was seeking STD testing not only for his benefit, but for the protection and benefit of his new, exclusive girlfriend, [the] plaintiff." Construing this pleading in the light most favorable to sustaining the sufficiency of the complaint, we must conclude that the plaintiff was an identifiable, if not identified, potential victim of the defendant's alleged negligence at the time that treatment was rendered.[11] That is to say, only one woman could have fit the description of Smith's exclusive girlfriend, and Smith presumably could have identified her by name if he had been asked to do so. See *Jarmie* v. *Troncale*, supra, 306 Conn. 597–98 (identifiable victim is one

whom it was possible to identify before negligent act occurred).

This identifiable victim requirement strikes an equitable balance between the interests at stake. Although a health care provider's liability may expand beyond his or her patients, its increased scope would encompass only those third-party victims of whose existence and potential exposure to harm the health care provider had been made aware—or could have become aware—prior to the negligent act.[12]

Second, since we decided *Jarmie*, we have held that, under limited circumstances, a health care provider is liable to third parties for professional negligence, albeit in the context of a bystander emotional distress claim. In *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 558, we concluded that "a bystander to medical malpractice may bring a claim for the resulting emotional distress . . . when the injuries result from gross negligence such that it would be readily apparent to a lay observer." Id., 560. In so holding, we relied on "our recent statement in *Jarmie* . . . eschewing any per se rule that [third-party tort] claims are categorically barred because of the absence of a physician-patient relationship . . . ."[13] (Citation omitted; internal quotation marks omitted.) Id., 574.

Accordingly, we find Connecticut precedent to be unsettled with respect to the particular question presented here. Although we never have been confronted with the question of a physician's duty to a third party with respect to the reporting of STD test results, and although we consistently have expressed a general aversion to extending the duty of health care providers to third parties, we have allowed, under limited circumstances, for the imposition of liability to an identifiable potential victim who will be foreseeably harmed by a physician's negligence.

### 3

In *Jarmie*, after we concluded that Connecticut precedent did not bar the imposition of the duty at issue, we proceeded to look to sister state authority and also to consider whether various policy factors favored the imposition of such a duty. *Jarmie* v. *Troncale*, supra, 306 Conn. 598–624. In this part of the opinion, we review how other jurisdictions have resolved similar cases. In part II B 4, we analyze the various policies at issue.

A number of other jurisdictions have held that, under certain circumstances, the duty of a medical professional to correctly diagnose and advise a patient who suffers from a communicable disease extends not only to the patient but also to third parties who may foreseeably contract that disease from the patient. See 61 Am. Jur. 2d 382, Physicians, Surgeons and Other Healers § 226 (2012) ("[a] physician is liable for his or her negligence in permitting persons to be exposed to infectious

or communicable diseases to the injury of the persons so exposed"); see also L. Gostin & J. Hodge, "Piercing the Veil of Secrecy in HIV/AIDS and Other Sexually Transmitted Diseases: Theories of Privacy and Disclosure in Partner Notification," 5 Duke J. Gender L. & Policy 9, 37 (1998); T. Bateman, annot., "Liability of Doctor or Other Health Practitioner to Third Party Contracting Contagious Disease from Doctor's Patient, 3 A.L.R.5th 370, 377–79, § 2 [a] (1992); G. Sarno, "Physician's Failure To Protect Third Party from Harm by Nonpsychiatric Patient," 43 Am. Jur. Proof of Facts 2d 657, 670–72, § 3 (1985). Many such courts, for example, have long held that physicians and other health care providers charged with diagnosing, treating, and controlling the spread of contagious diseases owe a duty of care to members of the immediate family of an infected patient. See, e.g., *Bolieu* v. *Sisters of Providence in Washington*, 953 P.2d 1233, 1239 (Alaska 1998); *Hofmann* v. *Blackmon*, 241 So. 2d 752, 753 (Fla. App. 1970), cert. denied, 245 So. 2d 257 (Fla. 1971); *Shepard* v. *Redford Community Hospital*, 151 Mich. App. 242, 245–46, 390 N.W.2d 239 (1986), appeal denied, 431 Mich. 872, 430 N.W.2d 458 (1988); *Skillings* v. *Allen*, 143 Minn. 323, 326, 173 N.W. 663 (1919); *Wojcik* v. *Aluminum Co. of America*, 18 Misc. 2d 740, 746–47, 183 N.Y.S.2d 351 (1959).[14] In some of these cases, the court held that the provider had an affirmative duty to notify or educate the third party, whereas, in other cases, the court simply held that a third party had standing to enforce the provider's duty to properly diagnose, treat, and educate the infected patient.

Although appellate cases addressing a physician's duties to a patient's premarital sexual partners are few and far between, the plaintiff and certain of the amici have identified several cases that permit an action to be brought either by a victim who was identifiable at the time of treatment or by any member of the class of persons who foreseeably could contract an STD from the patient as a result of the physician's negligence. See, e.g., *Reisner* v. *Regents of the University of California*, 31 Cal. App. 4th 1195, 1200–1201, 37 Cal. Rptr. 2d 518 (1995) (physician had duty to advise patient that he tested positive for human immunodeficiency virus (HIV) for benefit of unknown and unidentifiable but foreseeable sexual partners), review denied, California Supreme Court, Docket No. S045274 (May 18, 1995); *C.W.* v. *Cooper Health System*, 388 N.J. Super. 42, 60–62, 906 A.2d 440 (App. Div. 2006) (health care provider owed duty to inform patient of positive HIV test results and that duty extended to persons "within the class of reasonably foreseeable individuals whose health [was] likely to be threatened by the patient's ignorance of his own health status," including patient's future sexual partner); *DiMarco* v. *Lynch Homes-Chester County, Inc.*, 525 Pa. 558, 563–64, 583 A.2d 422 (1990) (when boyfriend of blood technician who acquired hepatitis

B from accidental exposure was member of class of persons whose health was likely to be threatened by exposure to such communicable disease, and her physicians gave erroneous advice to her regarding potential spread of that disease, boyfriend had cause of action against physicians); *Estate of Amos* v. *Vanderbilt University*, 62 S.W.3d 133, 138 (Tenn. 2001) (future husband and daughter of patient who was not informed that she was at risk of contracting HIV deemed members of identifiable class for purposes of hospital's third-party liability).

The defendant attempts to distinguish these cases on the ground that the plaintiff, unlike the sexual partners at issue in the cited cases, could have accompanied Smith when he sought STD testing and thus established a quasipatient relationship with the defendant sufficient to support a legal duty of care. We are not persuaded by this contention. First, the defendant provides no authority to support his theory that either the law or the medical profession confers a special status on a nonspouse sexual partner who accompanies a patient to his or her appointment with a physician and that that status is sufficient to support a legal duty of care. Second, it may well be that the defendant's suggested approach would interfere more directly with the physician-patient relationship and raise more substantial confidentiality concerns than would the imposition of the third-party duty of care for which the plaintiff advocates.

The defendant also notes that many of these cases involve potentially deadly diseases such as HIV that are more serious than herpes. We agree with the Alaska Supreme Court, however, that "the duty issue cannot turn on possible distinctions among diseases based on their severity and ubiquity. . . . Rather, the severity and ubiquity of the disease bear on what the [provider] must do to discharge the duty." *Bolieu* v. *Sisters of Providence in Washington*, supra, 953 P.2d 1240.

A Florida case, *Hawkins* v. *Pizarro*, 713 So. 2d 1036 (Fla. App.) review denied, 728 So. 2d 202 (Fla. 1998), provides an instructive contrast. In that case, a patient tested positive for hepatitis C, but her physician's office improperly advised her that she had tested negative. Id., 1037. Several months later, the patient met the plaintiff, whom she eventually married. Id. The plaintiff contracted hepatitis C from the patient and filed an action against the physician for medical negligence. Id. In upholding the trial court's granting of summary judgment in favor of the defendant, the District Court of Appeal of Florida recognized that hepatitis C is a highly contagious sexually transmitted disease and that a physician's duty of care in treating such diseases is intended in part for the benefit of third parties. Id., 1037–38. The court held that the physician owed no duty to the plaintiff, however, because he was neither identified

nor known to the physician at the time of the incorrect diagnosis. Id., 1038. By contrast, our research has not revealed any cases in which a court held that there was no third-party liability under circumstances such as those in the present case, in which STD testing was obtained expressly for the benefit of an identifiable, exclusive romantic partner. But cf. *D'Amico* v. *Delliquadri*, 114 Ohio App. 3d 579, 583, 683 N.E.2d 814 (1996) (plaintiff conceded that, under Ohio law, defendant physician owed her no direct duty to properly warn and advise his patient, plaintiff's boyfriend, as to communicability of genital warts).[15]

Beyond sister state authority, we further note that the Restatement (Second) of Torts appears to support the imposition of liability in a case such as this. As we previously discussed, § 311 of the Restatement (Second) provides that one who negligently gives false information may be held liable to a third party who predictably is injured by the recipient's reasonable reliance on that information. Notably, comment (b) to that section holds up the physician-patient relationship as the primary illustration of the rule: "The rule stated in this [s]ection finds particular application where it is part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends. Thus it is as much a part of the professional duty of a physician to give correct information as to the character of the disease from which his patient is suffering, where such knowledge is necessary to the safety of the patient *or others*, as it is to make a correct diagnosis or to prescribe the appropriate medicine." (Emphasis added.) 2 Restatement (Second), supra, § 311, comment (b), p. 106. Accordingly, we conclude that sister state and secondary authorities, although limited, generally support the imposition of a third-party duty under the circumstances alleged in the present case. As we discuss in part II B 5 of this opinion, sister state courts generally have not been swayed by the various practical concerns that the defendant and certain of the amici have raised and that the trial court found to be compelling.

### 4

Next, because the question presented is one of first impression in Connecticut, we consider various public policy factors that both this court and other authorities have deemed to be relevant to whether and under what circumstances a physician owes a duty of care to a nonpatient third party. On balance, we conclude that those factors support the imposition of a third-party duty of care under the circumstances of the present case.

In *Jarmie*, we identified the following factors, among others, as being relevant to the question of what duty of care a physician owes to nonpatient third parties: the purposes of the tort compensation system, including

efficiency, harm avoidance, and the appropriate distribution of loss; *Jarmie* v. *Troncale*, supra, 306 Conn. 599–602; the normal expectations of the participants in the activity under review and the public policy of encouraging participation in the activity, including the sanctity of the physician-patient relationship; id., 603–14; and the purposes that underlie Connecticut's medical malpractice statute, § 52-190a, including the avoidance of increased litigation and higher health care costs. Id., 592–93, 603, 614–15. When addressing third-party liability in the context of infectious diseases in particular, courts also have taken into account such considerations as "the foreseeability of third-party injury as shown by the patient's [infectious disease] carrier status, the degree of communicability of the patient's infectious disease, and the physician's actual or constructive knowledge of the ease of transmission of the patient's infectious disease; a public health statute [the] legislative intent [of which] is partly to protect third parties, such as a statute requiring physicians to report diagnosed instances of communicable or infectious diseases; breach of the physician's duty to exercise due care to protect third parties from foreseeable harm as shown by failure to report diagnosed instances of communicable or infectious diseases to public health authorities, failure to warn the patient with the infectious disease not to have contact with third parties, failure to warn the family of the patient with the infectious disease about the ease of, and precautions against, its transmission, failure to quarantine the patient with the infectious disease, failure to vaccinate the patient's family [members] against the infectious disease, conveyance of an affirmative indication that contact with the infected patient is not risky, and failure to take other reasonable measures to prevent exposure to the patient with the communicable disease; additional indicia of negligence, including failure to use standard available tests for diagnosing a patient's infectious disease, failure to interpret diagnostic test results correctly, and failure to diagnose the patient's infectious disease; and harm to a third-party plaintiff as shown by the third party's illness from exposure to the physician's infectious patient." T. Bateman, supra, 3 A.L.R.5th 379, § 2 [b].

a

For purposes of the present appeal, two of these factors, or sets of factors, are especially pertinent to our analysis. First, although we continue to recognize the sanctity of the physician-patient relationship and the need to exercise "restraint when presented with opportunities to extend the duty of health care providers to persons who are not their patients"; *Jarmie* v. *Troncale*, supra, 306 Conn. 592; we also recognize that such concerns are at their nadir, and a physician's broader public health obligations are at their zenith, with respect to the diagnosis and treatment of infec-

tious diseases.

Throughout history, both medical organizations and government entities have recognized not only the critical role that physicians play in combatting the spread of contagious diseases such as STDs, but also the concomitant fact that, in diagnosing and treating such diseases, a physician's duties and loyalties necessarily must be divided between the patient and other people whom the patient may infect. See generally L. Gostin & J. Hodge, supra, 5 Duke J. Gender L. & Policy 9. For example, "one of the earliest recorded public health strategies for STD prevention was to pierce the veil of secrecy surrounding these hidden diseases by notifying sexual partners . . . of infected patients . . . ." Id., 11. "Often known collectively as the 'duty to warn,' these [judicially imposed, common-law] obligations subsequently have been codified by many state legislatures." Id., 12. For example, partner notification measures were broadly implemented during the 1930s in an effort to control and eradicate the syphilis epidemic. Id., 21. Many states continue to operate provider based partner referral programs under which health care providers are responsible for contacting, on a confidential basis, the sexual partners of patients diagnosed with various STDs. See id., 27–32.

Indeed, even the American Medical Association (AMA), one of the amici supporting the defendant's position, which argues against the imposition of a third-party duty under these circumstances, has recognized that, "[a]lthough physicians' primary ethical obligation is to their individual patients"; American Medical Association, Code of Medical Ethics (2017) opinion 8.4, p. 128; they also have a responsibility "to protect and promote the health of the public." Id., opinion 8.1, p. 125. "[P]hysicians must balance dual responsibilities to promote the welfare and confidentiality of the individual patient and to protect public safety." Id., opinion 8.2, p. 126. The AMA has further observed that a physician's "long-recognized" professional responsibilities to non-patients are especially pronounced in the context of infectious disease, for which professional standards of care demand that a physician not only treat his or her own patients competently, but also go so far as to "[p]articipate in implementing scientifically and ethically sound quarantine and isolation measures in keeping with the duty to provide care in epidemics." Id., opinion 8.4, p. 128.

As we noted, the principle that a physician's duty to protect the broader public health and to help to deter the spread of contagious diseases at times transcends the physician's duty to his or her individual patient has long been codified in federal and state law. See, e.g., L. Gostin & J. Hodge, supra, 5 Duke J. Gender L. & Policy 58. Connecticut is no exception in this respect. Our legislature has, for example, enacted laws that

require physicians to test pregnant patients for syphilis and HIV; General Statutes § 19a-90; require health care providers to report certain communicable diseases to local and state public health officials; General Statutes § 19a-215; and permit physicians to warn, or to disclose confidential patient information for the purpose of warning, a known partner of a patient who has been diagnosed with an HIV infection or related disease. General Statutes § 19a-584 (b).

Perhaps most notably, since 2006, both the United States Centers for Disease Control and Prevention (CDC) and the AMA have approved the use of so-called expedited partner therapy programs to combat the spread of STDs.[16] Expedited partner therapy "is the delivery of medications or prescriptions by persons infected with an STD to their sex partners without clinical assessment of the partners"; in accordance with this protocol, "[c]linicians . . . provide patients with sufficient medications directly or via prescription for the patients and their partners."[17] The AMA has authorized the use of expedited partner therapy even though that approach to treating STDs "potentially abrogates the standard informed consent process, compromises continuity of care for patients' partners, encroaches [on] the privacy of patients and their partners, increases the possibility of harm by a medical or allergic reaction, leaves other diseases or complications undiagnosed, and may violate state practice laws." American Medical Association, supra, opinion 8.9, p. 132. In other words, the medical profession has formed the judgment that the need to stem the spread of STDs is so great, and the traditional physician-patient model so inadequate therefor, that an exception to the prevailing standard of care should be drawn so that physicians can provide treatment to third parties who are not their patients. Our legislature has embraced this novel approach, allowing practitioners to dispense oral antibiotic drugs to the sexual partners of patients who have been diagnosed with chlamydia or gonorrhea, two kinds of STDs, without first physically examining the partners. See General Statutes § 20-14e (e).

We recognize that none of these laws directly applies to herpes. This presumably reflects in part the fact that that disease is not curable at present, and, thus, the sexual partners of patients infected with herpes would not be candidates for programs such as expedited partner therapy. At the same time, the fact that herpes is incurable highlights the extent to which a physician's duties in a case such as this run to third parties as well as to the patient, as it will be the patient's potential sexual partners who are the most direct beneficiaries of the diagnosis.[18]

Perhaps more than in any other field of medicine, then, the duty of care that a physician owes to his or her patient in the diagnosis and treatment of infectious

and sexually transmitted diseases also, necessarily, entails some duty to third parties who are likely to contract the disease from the patient. As the Supreme Court of Pennsylvania explained, "[c]ommunicable diseases are so named because they are readily spread from person to person. Physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others. The patient must be advised to take certain sanitary measures, or to remain quarantined for a period of time, or to practice sexual abstinence or what is commonly referred to as safe sex." (Internal quotation marks omitted.) *DiMarco* v. *Lynch Homes-Chester County, Inc.*, supra, 525 Pa. 562. The court continued: "Such precautions are taken not to protect the health of the patient, whose well-being has already been compromised, [but] rather such precautions are taken to safeguard the health of others." (Emphasis omitted.) Id.; cf. *Davis* v. *Rodman*, 147 Ark. 385, 391–92, 227 S.W. 612 (1921) ("[o]n account of his scientific knowledge and his peculiar relation, an attending physician is, in a certain sense, in custody of a patient afflicted with [an] infectious or contagious disease"); V. Schwartz et al., Prosser, Wade and Schwartz's Torts: Cases and Materials (11th Ed. 2005) p. 432 (custody of persons with contagious diseases may give rise to singular duty to control conduct of other person).

At the same time, we perceive little risk that imposing a third-party duty under these circumstances would interfere with the physician-patient relationship, breach patient confidentiality, or require the practice of costly defensive medicine. See, e.g., *Reisner* v. *Regents of the University of California*, supra, 31 Cal. App. 4th 1203. Although the plaintiff contends that the defendant owed her a duty of care as an identifiable potential victim who foreseeably would rely on the accuracy of his diagnosis, her argument is that that duty would have been fully satisfied if the defendant simply had provided the accurate test results to Smith, his patient. In other words, the defendant was under no obligation to contact the plaintiff, to otherwise ensure that she was made aware of Smith's test results, or to do anything other than fulfill his undisputed professional obligation to accurately convey his patient's test results to the patient himself.[19] The concerns of the dissent that our decision in this case will somehow result in the disclosure of confidential medical information are, therefore, wholly unfounded.

In conclusion, we think that it is beyond cavil that physicians such as the defendant owe some duty of care to third parties when diagnosing and treating a patient who suffers from an STD. We do not believe that imposing the duty for which the plaintiff advocates would intrude on the sanctity of the physician-patient relationship. Indeed, the duty at issue here—simply to

accurately relay the patient's test results to the patient —is far more limited and less intrusive than the public health reporting and partner notification requirements that have been imposed on physicians in the context of diagnosing and treating infectious diseases.

b

The second set of factors that governs our analysis relates to the purposes of the tort compensation system. "[T]he fundamental policy purposes of the tort compensation system [are] compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct . . . . It is sometimes said that compensation for losses is the primary function of tort law . . . [but it] is perhaps more accurate to describe the primary function as one of determining when compensation [is] required. . . . An equally compelling function of the tort system is the prophylactic factor of preventing future harm . . . . The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. . . . [Of course] [i]mposing liability for consequential damages often creates significant risks of affecting conduct in ways that are undesirable as a matter of policy. Before imposing such liability, it is incumbent [on] us to consider those risks." (Citations omitted; internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 599–600. In the present case, these factors also weigh strongly in favor of imposing a duty on health care providers to identifiable and foreseeable third-party victims such as the plaintiff.

First, we observe that, if the defendant is not held liable to the plaintiff under these circumstances, then, in all likelihood, she will be without remedy or compensation for her injuries. It is doubtful, for example, that the plaintiff could recover in negligence from Smith, who acted responsibly in seeking regular STD testing and did not have sexual contact with her until he was possessed of a reasonable, good faith belief that he was free of STDs.

The trial court, while recognizing "the absence of any other source of compensation for the [plaintiff's] harm," apparently concluded that this factor was mitigated by (1) the fact that "the cost of medical treatment likely would be covered by health insurance," and (2) the plaintiff's ability to engage in "self-protective measures . . . ." The dissent also is of the view that the plaintiff is not without recourse because she "may well be covered by public or private health insurance policies . . . ."

There is nothing in the record to support the pure speculation that the plaintiff had, or will continue to have, adequate health insurance.[20] Nor do we think it is appropriate to expect ordinary health insurance policies, or taxpayers, to bear the costs of a physician's

negligence. Medical malpractice policies exist to spread such costs.

In any event, the availability of insurance will be of little consolation to the plaintiff, insofar as genital herpes is presently an incurable disease. E.g., E. Moore, Encyclopedia of Sexually Transmitted Diseases (2005) p. 135; Mosby's Medical Dictionary (8th Ed. 2009) p. 872. We must assume that, for the remainder of her life, the plaintiff will suffer periodic outbreaks of painful blisters or ulcers associated with the virus. See, e.g., E. Moore, supra, pp. 132–33. Her desirability as a potential romantic partner may be diminished. And, if she should become pregnant, she will have to contend with the risk that she may transmit the virus to her newborn child. See, e.g., id., p. 135. Some of these injuries will not be covered—or may not be adequately covered—by medical insurance, and we ought not pretend otherwise. Only the defendant can compensate the plaintiff for these losses.

With respect to "self-protective measures," we presume that the trial court was referring to the fact that, notwithstanding Smith's apparently negative STD test results, the plaintiff could have further reduced the risk that she would contract an STD either by using prophylactics or abstaining from intercourse with Smith altogether. Even if we were to assume, for the sake of argument, that it would be reasonable and right to expect couples, such as the plaintiff and Smith, to abstain from sexual intimacy, or to consistently practice safe sex while dating, that would only push back the problem. At some point, their relationship could have progressed to a point at which they would have married and consummated their union. At that point, a wedding band would not have been proof against the defendant's negligence. See *Hawkins* v. *Pizarro*, supra, 713 So. 2d 1037 (STD was misdiagnosed prior to courtship, and sexual partner was diagnosed after marriage).

Second, the flip side of the coin is that, if the plaintiff cannot hold the defendant responsible for his alleged negligence, then errors of this sort will go unadmonished. Patients such as Smith are unlikely to have incurred any legally cognizable damages as a result of an incorrect test report and, therefore, may be unable to recover from a defendant physician. We recognize that not every wrong is compensable in tort and that losses, even unjust losses, sometimes must be allowed to lie where fate has cast them. See *Jarmie* v. *Troncale*, supra, 306 Conn. 599. Under these circumstances, however, imposing third-party liability would play an important role in spurring physicians such as the defendant to take greater care in reporting STD lab results. As the California Court of Appeal recognized in *Reisner* v. *Regents of the University of California*, supra, 31 Cal. App. 4th 1195, the law should "encourage the highest standard of care concerning communicable and infec-

tious diseases . . . ." Id., 1201; see also id., 1204 ("we believe that a doctor who knows he is dealing with the [twentieth] [c]entury version of Typhoid Mary ought to have a very strong incentive to tell his patient what she ought to do and not do and how she ought to comport herself in order to prevent the spread of her disease" [footnote omitted]). Holding the defendant liable to the plaintiff would create such an incentive and deter the careless misreporting of STD test results.

The trial court, while recognizing that imposing third-party liability under these circumstances could play an important deterrent function and help control the insidious spread of STDs, expressed concern over what it saw as potentially unforeseen consequences. The court speculated, for instance, that physicians themselves might feel compelled to discuss lab results with their patients, which could be more costly and less efficient than relying on nurses or office staff to relay results. We do not find this concern compelling.

A patient who seeks medical attention to be tested for a disease, any disease, has a reasonable expectation that the test results will be reported accurately, by whatever means. See, e.g., L. Casalino et al., "Frequency of Failure To Inform Patients of Clinically Significant Outpatient Test Results," 169 Archives Internal Med. 1123, 1123 (2009) ("[f]ailures to inform patients of abnormal test results . . . are common and legally indefensible factors in malpractice claims"). The risks and costs associated with misinforming a patient that he does not have a particular disease can be dramatic. Those include the direct costs to the patient and the health care system, as when, for example, treatment of a serious illness such as cancer is irremediably delayed, or, as in the present case, through the inadvertent infection of third parties by a patient who falsely believes that he is free of STDs. Holding health care providers responsible for errors of the sort alleged will help to maintain public trust in the reliability of the STD reporting system and, therefore, encourage continued participation in this important public health regimen.[21]

Of course, it ultimately will be for the jury to determine whether a reasonable health care provider would have reported Smith's test results differently, whether through direct physician-to-patient communications or through the use of additional fail-safes and quality assurance measures. But we certainly are not prepared to say, as a matter of law, that, whatever added costs might be entailed by a quick telephone call or a letter from one's physician, or a policy requiring office staff to double check that they are reporting test results accurately, they are too onerous relative to the human, financial, and public health costs associated with a false negative report.[22] Cf. *Reisner* v. *Regents of the University of California*, supra, 31 Cal. App. 4th 1200 (it is not unreasonable to expect physicians to give additional

warning or warnings).

Along these same lines, we note that it would not be unreasonable for a jury to conclude that the defendant, and not the plaintiff or Smith, was most effectively and economically situated to avoid the harm that befell the plaintiff. In this era of technologized medicine, the conveyance of lab results is a regular and central component of a physician's professional duties. The physician has exclusive access to the original lab results, until such time as they are shared with or conveyed to the patient. As between the defendant, on the one hand, who can avoid errors of this sort simply by double checking the results before or after speaking with the patient; see L. Casalino et al., supra, 169 Archives Internal Med. 1123 (discussing "relatively simple" best practices); and Smith and the plaintiff, on the other, who could ensure that the plaintiff remained free of STDs only by permanently abstaining from intimate contact,[23] a jury reasonably could conclude that the defendant was the party who was in the best position to avoid the harm at the lowest cost and, therefore, should bear the costs of the loss. See, e.g., *Rodi Yachts, Inc.* v. *National Marine, Inc.*, 984 F.2d 880, 883–84, 888 (7th Cir. 1993).

At the same time, physicians such as the defendant can most readily bear and spread through malpractice insurance the costs associated with errors of the sort alleged. We are not convinced that such errors are both so prevalent and so ineluctable that imposing third-party liability, solely with respect to identifiable victims, will meaningfully impact insurance rates or overall health care costs.[24] For these reasons, we conclude that the relevant policy considerations weigh heavily in favor of allowing liability under these circumstances.

5

Finally, we address two concerns that the defendant and certain of the amici have raised and that the trial court found compelling. First is the slippery slope issue. The trial court observed, and we agree, that, "[i]n a sense, [the] plaintiff's complaint identifies a best case scenario . . . ." That is to say, the plaintiff and Smith were involved in an exclusive romantic relationship at the time Smith sought STD testing, Smith informed the defendant that he was seeking testing for the benefit and protection of the plaintiff, and the plaintiff subsequently agreed to engage in sexual relations with Smith in reliance on the test results as reported to Smith. This means that the defendant's potential liability for negligently misreporting Smith's test results extended to at most one nonpatient third party, a party of whose existence the defendant was aware at the time of treatment, who could foreseeably contract a contagious STD if an erroneous negative test result were reported, and to whom he owed no independent duty beyond the duty already owed to Smith to accurately report his test results.

Nevertheless, the trial court expressed concerns that imposing a duty under these limited circumstances could open the floodgates. For example, the court questioned whether, if Smith had been dating multiple women at the time, or later began to date other women, with whom Smith had not discussed STDs, the defendant would owe a duty to a large and ill-defined class of potential plaintiffs. The trial court also questioned whether, under different circumstances, a physician such as the defendant might feel compelled to question a patient regarding his sexual partners, or to contact those partners to discuss the patient's STD status, or at least to ensure that the patient accurately relayed the test results to all of his sexual partners. Finally, the court questioned whether it makes sense to make liability hinge on the sort of mutual STD testing arrangement to which the plaintiff and Smith agreed.

Beginning with the last point, we emphasize that the defendant's liability does not hinge on the fact that Smith and the plaintiff entered into a mutual testing agreement. The alleged fact that Smith sought and obtained STD testing at the time could become relevant at trial only insofar as it would support the plaintiff's theory of causation, that is, that she was free of STDs until she became intimate with Smith during or after July, 2013.

Beyond that, we emphasize that the duty that we recognize today is quite limited. It extends only to identifiable third parties who are engaged in an exclusive romantic relationship with a patient at the time of testing and, therefore, may foreseeably be exposed to any STD that a physician fails to diagnose or properly report. And the physician fully satisfies that third-party duty simply by treating *the patient* according to the prevailing standard of care and accurately informing *the patient* of the relevant test results. See, e.g., *Reisner* v. *Regents of the University of California*, supra, 31 Cal. App. 4th 1203; *Pate* v. *Threlkel*, 661 So. 2d 278, 281–82 (Fla. 1995); *Estate of Amos* v. *Vanderbilt University*, supra, 62 S.W.3d 138. Whether there are other, broader circumstances under which a physician may be held to owe a duty of care to a nonpatient third party who foreseeably contracts an infectious disease as a result of the physician's negligence is a question that we need not resolve today.

Nor, as we have discussed, are we overly concerned that our recognition of a duty under the specific circumstances of this case will create a flood of litigation, increase insurance costs, or discourage physicians from offering STD testing. See, e.g., *Bolieu* v. *Sisters of Providence in Washington*, supra, 953 P.2d 1239. The amici supporting the defendant's position have given us no reason to believe that errors of the sort alleged are commonplace or that they cannot readily be avoided by cost-effective quality assurance measures. As the

California Court of Appeal explained in rejecting such arguments, "[a]rguments premised on opened flood-gates and broken dams are not persuasive [when] . . . we suspect that only a few drops of water may spill onto a barren desert." *Reisner* v. *Regents of the University of California*, supra, 31 Cal. App. 4th 1204. And, of course, if the legislature perceives differently the risk that conferring standing on individuals such as the plaintiff will result in a health care funding crisis, then nothing bars that body from imposing whatever restrictions it deems prudent on common-law actions of this sort.

Second, we do not share the trial court's concern that recognizing a third-party cause of action for negligent misreporting of STD test results would be impracticable. The court reasoned that, in many such instances, a patient such as Smith and an alleged victim such as the plaintiff will no longer be romantically involved by the time an action reaches the trial stage and, therefore, that key evidence—the patient's medical records—may not be available. The court noted that federal and state privacy laws could bar a plaintiff from obtaining and presenting such records without the patient's consent and that the patient might have little incentive to disclose such records to a former partner and have his or her medical and sexual history become part of the public record. The court also appeared to suggest that, in cases in which the patient does cooperate with the plaintiff, the patient might agree to selectively provide only those records that supported the plaintiff's case, leaving the physician unable to defend himself or herself.

Although we do not discount the possibility that the concerns that the trial court raises could present logistical hurdles in some other case, those hypothetical challenges do not counsel against allowing the plaintiff to hold the defendant accountable in a case such as this, in which the plaintiff apparently will have full access to the medical records necessary to put on her case.[25] As we noted in *Jacoby* v. *Brinckerhoff*, supra, 250 Conn. 86, "evidentiary constraints at trial do not, themselves, affect the sufficiency of a stated cause of action . . . ."[26] For all of the foregoing reasons, we hold that the trial court incorrectly concluded that, as a matter of law, the defendant owed no duty of care to the plaintiff with respect to the reporting of Smith's STD test results.[27]

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion D'AURIA, MULLINS and VERTEFEUILLE, Js., concurred.

* This appeal originally was argued before a panel of this court consisting of Justices Palmer, McDonald, Robinson, D'Auria, Mullins, and Kahn. Thereafter, Justice Vertefeuille was added to the panel. Justice Vertefeuille read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision. The listing of justices reflects their

seniority status on this court as of the date of oral argument.

[1] The plaintiff appealed to the Appellate Court from the trial court's judgment, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] We note that the defendant could have filed a request to revise; see Practice Book § 10-35; in order to separate out and separately address the plaintiff's medical malpractice and common-law negligence claims, but did not do so.

[3] As we discuss in part II of this opinion, the plaintiff's allegations may fit most neatly under the rubric of negligent misrepresentation. Because neither party has addressed the issue, however, we need not determine whether the allegations in the complaint are legally sufficient to plead a cause of action in negligent misrepresentation under the law of this state.

[4] It is true that there are rare circumstances in which expert testimony may not be necessary to establish that medical malpractice has occurred, such as when a surgeon leaves a surgical implement inside a patient after completing an operation. Such gross negligence may be assessed by a jury without reference to the prevailing standard of professional care. See, e.g., *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 580, 113 A.3d 932 (2015). This is not such a case because, among other reasons, the alleged error did not involve a failure on the part of the defendant to exercise that degree of professional skill or judgment that a reasonably prudent health care provider would have exercised under the circumstances.

[5] It is not clear from the complaint whether Smith allegedly told the defendant the plaintiff's actual name or simply indicated that he had an exclusive girlfriend for whose benefit he was seeking STD testing. Our analysis would be the same regardless of whether the plaintiff was actually identified to the defendant by name or merely remained identifiable on the basis of Smith's description of her as his exclusive girlfriend.

[6] The trial court determined, and we agree, that a jury reasonably could find that "it is foreseeable that a sexual partner of a patient who erroneously had been told that he did not suffer from any STDs might contract the STD with all of the health related consequences of such an illness."

[7] We granted permission for the following groups to submit amicus briefs: the Connecticut Trial Lawyers Association, in support of the plaintiff; and the American Medical Association, the Connecticut Hospital Association, and the Connecticut State Medical Society, in support of the defendant.

[8] We emphasize that the question of negligent misrepresentation is not before us, and we express no opinion as to whether Connecticut law recognizes a third-party cause of action in negligent misrepresentation against attorneys, accountants, auditors, or medical professionals. See footnote 3 of this opinion. Our point is simply that the concerns that the defendant and the dissent raise regarding potentially limitless liability are the same concerns that have been raised, and satisfactorily addressed, in various professional contexts across many jurisdictions.

[9] Neither party advocates that we overrule or reconsider *Jarmie*.

[10] The dissent, while conceding that this remains an open question under *Jarmie*, fails to note that, in *Jarmie*, we specifically distinguished cases from other jurisdictions that imposed third-party liability on physicians in the context of failing to warn about communicable diseases. Indeed, aside from one brief footnote, the dissent, which quotes heavily from *Jarmie*, barely acknowledges that the present case raises a fundamentally different question—the third-party liability of a medical professional with respect to the misreporting of a sexually transmitted disease—than that at issue in *Jarmie* or any of our previous cases.

As we explain more fully hereinafter, it is beyond cavil that both the law and the medical profession impose broader and different duties on physicians, duties that extend beyond the confines of the physician-patient relationship, with respect to the diagnosis of STDs and other infectious diseases. Of course, it is not unreasonable to take the position, as the dissent has, that, for reasons of public policy, we never should impose on physicians any duties beyond those established by the legislature. We think it would be a mistake, however, for this court to simply conclude that *Jarmie* disposes of the issue presented in this case without carefully evaluating the fundamentally distinct considerations that characterize the context of communicable diseases.

[11] We recognize that there could be cases in which a dispute arises over whether the plaintiff is in fact the individual who was identifiable as a potential victim prior to the occurrence of negligence—if, for example, the defendant had argued that the plaintiff was not in fact the exclusive girlfriend

of whom he was made aware when Smith sought STD testing. Because the defendant has not made that argument in the present case, for present purposes, the identity of the plaintiff as the identifiable victim is not in question. If it were, the question of identity would, of course, be a question of fact for the fact finder.

[12] In *Jarmie*, we also relied on the fact that the defendant physician had not undertaken any affirmative action that placed the plaintiff at risk. *Jarmie* v. *Troncale*, supra, 306 Conn. 624. In the present case, however, the plaintiff has alleged that the defendant affirmatively informed Smith that he was free of STDs, knowing that she might become intimate with Smith in reliance on that information.

[13] We are not persuaded by the efforts of the dissent to distinguish *Squeo*. The dissent contends that *Squeo* is different because the claim in that case sounded in medical malpractice rather than ordinary negligence. See footnote 2 of the dissenting opinion. This argument proves too much.

The entire dissent is predicated on the concern that any recognition that physicians have duties to third parties will compromise the sanctity of the physician-patient relationship, jeopardize the confidentiality of patient records, promote unnecessary defensive medicine, and bring about higher insurance rates and health care costs, driving doctors out of practice and adversely affecting patient care. As we have explained, however; see part I B of this opinion; medical malpractice claims are those that go to the core of the physician-patient relationship: physicians are sued in their capacities as medical professionals, on the basis of the specialized medical care of a patient, involving the exercise of medical judgment. If nonpatient third parties can have standing to prosecute claims of *that* sort, as *Squeo* says they can, then, a fortiori, allowing them to bring claims sounding in ordinary negligence need not intrude on the sanctity of the physician-patient relationship. And, if our decision in *Squeo* has not resulted in the parade of horribles that the dissent invokes (and which are, in essence, the very same horribles that the defendants and certain of the amici in *Squeo* invoked); see *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 575–77; then we can have some reassurance that the alarmist warnings in the present case will be no more prescient.

[14] One sister state court also has recognized a third-party duty to the spouse of a hospital employee who was not informed that he had been exposed to the human immunodeficiency virus (HIV), an STD, in the line of work. See *Vallery* v. *Southern Baptist Hospital*, 630 So. 2d 861, 862, 868–69 (La. App. 1993), cert. denied, 634 So. 2d 860 (La. 1994). But see *Doe* v. *Pharmacia & Upjohn Co.*, 388 Md. 407, 409–10, 879 A.2d 1088 (2005) (company that cultivated and harvested HIV cultures for incorporation into test for HIV antibodies owed no duty of care to spouse of employee who tested positive for HIV following workplace exposure).

[15] Most of the cases on which the dissent relies address unrelated questions, such as whether a physician has a duty to third parties to properly advise a patient as to his or her fertility status or potential to infect caregivers. See, e.g., *Dehn* v. *Edgecombe*, 384 Md. 606, 616, 865 A.2d 603 (2005); *Candelario* v. *Teperman*, 15 App. Div. 3d 204, 204–205, 789 N.Y.S.2d 133 (2005). The dissent also relies on *Hawkins*, which, as we have explained, is wholly consistent with the rule that we announce today. Indeed, the court in *Hawkins* concluded that a physician's duty to accurately report the results of an STD test does run to identified third parties whose existence is known to the physician and who will foreseeably be infected as a result of the inaccurate report, precisely because the duty is intended in part for the benefit of those parties. See *Hawkins* v. *Pizarro*, supra, 713 So. 2d 1037–38.

[16] American Bar Association, Recommendation (August 11–12, 2008) p. 2, available at https://www.cdc.gov/std/ept/onehundredsixteena.authcheckdam.pdf (last visited July 5, 2019).

[17] American Bar Association, Recommendation (August 11–12, 2008) p. 2, available at https://www.cdc.gov/std/ept/onehundredsixteena.authcheckdam.pdf (last visited July 5, 2019).

[18] We emphasize that our recognition of a third-party duty in the present case is grounded in the unique characteristics of STDs in general and herpes in particular. Specifically, one—if not the primary—reason that patients seek to be tested for diseases such as herpes is to be able to represent to a potential sexual partner that they are disease free. Accordingly, the dissent's fear that physicians will be liable to third parties for the improper diagnosis of conditions such as chicken pox, influenza, or the measles is unfounded. See footnote 9 of the dissenting opinion.

[19] The dissent's position appears to be that, if the defendant's duty to the

plaintiff is no more than the duty he owes to Smith to accurately report the test results, then holding the defendant liable to the plaintiff as well as Smith "would not reduce the potential for harm because health care providers would be required to do no more than they already must do to fulfill their duty to patients." (Internal quotation marks omitted.) Setting aside the fact that increasing a physician's potential liability will presumably increase his or her incentive to avoid negligent errors of the type alleged, the present case is readily distinguishable from *Jarmie*, from which the dissent draws the quoted language. In the present case, unlike in *Jarmie*, which involved an automobile accident caused by the defendant physician's patient, Smith himself is unlikely to have any cause of action against the defendant, insofar as there is no indication that he suffered legally cognizable damages. Accordingly, the defendant will face potential liability only to an identifiable third-party victim such as the plaintiff.

[20] We note that "[m]any people in Connecticut are currently without health insurance, usually because they think they [cannot] afford it, are unemployed or are at higher risk due to [preexisting] conditions." Insurance for the Uninsured, available at http://www.cthealthchannel.org/individuals/group-health-insurance/insurance-for-the-uninsured/ (last visited July 5, 2019).

[21] In order to prevent the spread of genital herpes, the CDC recommends that individuals take exactly the precautions taken by the plaintiff in the present case: "The surest way to avoid transmission of STDs, including genital herpes, is to abstain from sexual contact, *or to be in a long-term mutually monogamous relationship with a partner who has been tested for STDs and is known to be uninfected.*" (Emphasis added.) Centers for Disease Control and Prevention, Genital Herpes—CDC Fact Sheet (Detailed Version), available at https://www.cdc.gov/std/herpes/stdfact-herpes-detailed.htm (last visited July 5, 2019). The Department of Public Health also has recognized that encouraging sexually active individuals to seek regular STD testing is a high public health priority. See Connecticut Department of Public Health, Press Release, Department of Public Health Urges Residents To Be Tested for Sexually Transmitted Diseases (April 28, 2010), available at https://portal.ct.gov/DPH/Press-Room/Press-Releases---2010/April-2010/Department-of-Public-Health-Urges-Residents-To-Be-Tested-for-Sexually-Transmitted-Diseases (last visited July 5, 2019).

We disagree with the dissent that the legally relevant question is whether "a person harmed in the manner that this plaintiff was harmed would expect to be compensated by the physician  . . . ." Clearly, the plaintiff expected there was some reasonable possibility that the defendant would be held accountable, or she would not have brought the present action. Equally clearly, she could not have had a high degree of confidence in a favorable result, as no Connecticut court had previously recognized such a duty. When the issue is, as a question of first impression, whether a previously unrecognized common-law duty should be recognized, it makes little sense (and is circular) for the result to hinge on whether a layperson accurately would predict that an appellate court would rule in her favor. The salient question in this case, rather, is whether a person in the plaintiff's position reasonably would expect that a physician would adopt an STD test result reporting protocol with an eye toward the potentially serious harm that could befall a patient's exclusive sexual partner if a negative result should be erroneously reported.

[22] It may well be that the steady march of technology already has rendered purely academic the trial court's concerns, as many patients now are able to view their test results directly through online electronic portals. See Office of the National Coordinator for Health Information Technology, ONC Data Brief No. 40 (April, 2018) pp. 1, 6, available at https://www.healthit.gov/sites/default/files/page/2018-04/HINTS-2017-Consumer-Data-Brief-april-2018.pdf (last visited July 5, 2019) (stating that, as of 2017, 52 percent of individuals were offered online access to their medical records, and that lab results were most frequently accessed information).

The dissent speculates that recognizing a third-party duty under these circumstances will lead physicians such as the defendant to engage in costly defensive medicine, which could raise the cost of health care. The dissent does not contend, however, that recognizing such a duty will lead to the unnecessary use of expensive medical tests or other modalities typically associated with defensive medicine. Rather, the defensive medicine that a physician may embrace under these circumstances is the avoidance of asking a patient to identify his or her sexual partner or asking whether he or she is seeking STD testing for the purpose of informing future sexual partners of the results.

We think that there is little realistic risk that physicians will alter their standards of care when errors of the sort alleged can be so easily and economically avoided by adopting simple quality control measures and exercising reasonable diligence. In any event, we fail to understand the harm that would result if a physician did not go out of his or her way to specifically identify a patient's sexual partner.

[23] We note that herpes may be transmitted by forms of intimate contact other than intercourse. See, e.g., 1 Harrison's Principles of Internal Medicine (A. Fauci et al. eds., 14th Ed. 1998) p. 1085.

[24] The dissent posits that our decision could have a significant impact on the health care system because more than 15,000 new STDs are diagnosed in Connecticut each year and, *if* we assume that each newly infected individual was involved in an exclusive sexual relationship, then their more than 15,000 partners all represent potential plaintiffs. This argument falters on many levels.

Not surprisingly, having multiple and/or anonymous sexual partners is among the primary risk factors for contracting STDs. Centers for Disease Control and Prevention, STDs and HIV—CDC Fact Sheet (Detailed Version), available at https://www.cdc.gov/std/hiv/stdfact-std-hiv-detailed.htm (last visited July 5, 2019); see also L. Finer et al., "Sexual Partnership Patterns as a Behavioral Risk Factor for Sexually Transmitted Diseases," 31 Fam. Plan. Persp. 228, 228–30 (1999). By contrast, if an individual is engaged in a truly and mutually monogamous relationship, then he or she is unlikely to contract an STD other than from his or her partner (who would not, in that scenario, be a potential plaintiff in a case such as this). Accordingly, the dissent's assumption that each of the more than 15,000 individuals who contracted an STD in Connecticut in 2015 was involved in an exclusive sexual relationship seems highly implausible. Nor is there any reason to believe that a significant percentage of STD test results are inaccurately reported to the patient.

Moreover, we note that, of the more than 15,000 new cases of selected STDs to which the dissent refers, the vast majority of them consist of chlamydia and, to a lesser extent, gonorrhea; see Connecticut Department of Public Health, STD Statistics in Connecticut, available at http://www.ct.gov/dph/cwp/view.asp?a=3136&q=388500 (last visited July 5, 2019); diseases that, unlike herpes, are readily treatable with antibiotics. See, e.g., E. Moore, supra, pp. 77, 107–109. Accordingly, even for the fraction of new STD cases that might involve an identifiable victim, in a newly exclusive relationship, who would become infected as a result of an erroneous test report, the vast majority would suffer minimal damages and would be unlikely to go to the trouble of bringing a legal action.

In sum, there is no reasonable basis for concluding that the present case is anything other than a singularity, let alone a harbinger of thousands of future legal actions. For example, there is no indication that other jurisdictions that have allowed such actions to proceed have experienced a spike in medical malpractice rates, and we are aware of no evidence to support the dissent's warning that such an increase is "very likely" in this state.

[25] Both parties have represented that Smith executed authorizations allowing the plaintiff to obtain and use his medical records for purposes of this action.

[26] Moreover, as in all cases, trial courts are free to take reasonable measures in mitigation of any such problems.

[27] Lest there be any confusion, we emphasize that the existence of a third-party duty with respect to the accurate reporting of STD test results does not hinge on whether a patient and a victim remain romantically involved or whether the patient agrees to cooperate in the victim's legal action. Our point is simply that, as in any legal action, the fact that a particular claim may be difficult to prove from an evidentiary standpoint does not imply that the claim itself is not legally cognizable.