# TATAYANA OSBORN ET AL. *v.* CITY OF WATERBURY ET AL.
## (SC 20129)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff mother and her minor child, T, an elementary school student, sought to recover damages from the defendant city of Waterbury and the defendant Waterbury Board of Education for injuries that T sustained when she was physically assaulted by two or more schoolchildren on a Waterbury public school playground during recess. The plaintiffs alleged, inter alia, that the defendants and their employees failed to adequately supervise the schoolchildren, including T, both in and out of the classroom. The case was tried to the court, which found that T's injuries were the result of the defendants' failure to provide sufficient personnel to exercise proper control over the number of students on the playground at the time. There was evidence introduced at trial that the school had a student population of about 400 and that at least 2 paraprofessionals who attended the incident involving T ran from inside the building to address the situation. The defendants appealed to the Appellate Court from the judgment in favor of the plaintiffs, claiming that the trial court improperly rejected the defendants' special defense of governmental immunity, incorrectly concluded that T's injuries were caused when an inadequate number of staff members were assigned to

supervise up to 400 students when there was evidence that there were no more than 50 students on the playground at the time in question, improperly found, in the absence of expert testimony, that the number of assigned staff members was insufficient to control as many as 400 students, and improperly awarded certain damages. The Appellate Court concluded that, in the absence of expert testimony, the trial court could not properly have found that the defendants breached their duty of care to T on the basis that there was an allegedly inadequate number of adults on the playground to supervise the students. Accordingly, the Appellate Court reversed the trial court's judgment and remanded the case to that court with direction to render judgment for the defendants. The Appellate Court did not reach any of the defendants' other claims. On the granting of certification, the plaintiffs appealed to this court. *Held* that, under the facts of the present case, expert testimony was not required to establish the plaintiffs' claim of inadequate supervision, and, because the Appellate Court incorrectly concluded that the trial court could not determine that the defendants breached their duty of care to T without such testimony, the judgment of the Appellate Court was reversed and the case was remanded to that court for consideration of the remaining issues on appeal: although the education profession is a highly regulated field, the fact finder was required to determine only whether there was adequate supervision of children under the circumstances of the case, a task that was within the common knowledge of a layperson and that did not require the fact finder to apply scientific or specialized knowledge; moreover, even if there had been expert testimony regarding the desired ratio of staff to children and the facts demonstrated that the school met that ratio, the fact finder still could have determined that the supervision was inadequate because adequacy was not based simply on numbers, and nothing in the complaint limited the plaintiffs' inadequate supervision claim to a mere numerical calculation between the number of students and the number of adults.

(*Three justices dissenting in one opinion*)

Argued March 27—officially released December 3, 2019

*Procedural History*

Action to recover damages for personal injuries sustained by the named plaintiff as a result of the defendants' alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the action was withdrawn as to the defendant Stephanie Pascale et al.; thereafter, the case was tried to the court, *Hon. Barbara J. Sheedy*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the plaintiffs, from which

Osborn *v.* Waterbury

the named defendant et al. appealed to the Appellate Court, *Lavine*, *Prescott* and *Harper*, *Js.*, which reversed the trial court's judgment and remanded the case with direction to render judgment for the named defendant et al., and the plaintiffs, on the granting of certification, appealed to this court. *Reversed*; *further proceedings.*

*Richard M. Franchi*, for the appellants (plaintiffs).

*Daniel J. Foster*, acting assistant corporation counsel, for the appellees (named defendant et al.).

*Opinion*

MULLINS, J. This appeal arises from an action filed by the plaintiffs, Tatayana Osborn (child), a minor child, by and through her mother, Tacarra Smith, alleging negligence on the part of the defendant city of Waterbury (city) and the defendant Waterbury Board of Education (board) for injuries sustained by the child during an altercation with other students during recess at a Waterbury public school.[1] In this certified appeal,[2] we must determine whether the Appellate Court correctly concluded that expert testimony was necessary to

---

[1] The plaintiffs also brought this action against Stephanie Pascale, a fifth grade teacher; Charles Stango, the president of the board; Danielle Avalos, a paraprofessional at the school; and Donna Perreault, the school principal. They withdrew the action against Pascale and Stango in the trial court. In its articulation, the court clarified that it did not find that Avalos and Perreault were liable for the plaintiffs' injuries. Avalos and Perreault, therefore, withdrew from the present appeal. In this opinion, we refer to the city and the board as the defendants.

[2] We granted the plaintiffs' petition for certification to appeal, limited to the following issues: (1) "In reversing the judgment of the trial court, did the Appellate Court properly determine that expert testimony was necessary to establish the standard of care?"

(2) "Did the plaintiffs receive adequate notice of the need for expert testimony to determine the scope of the duty of care such that a directed judgment was appropriate in this case?" *Osborn* v. *Waterbury*, 329 Conn. 901, 184 A.3d 1214 (2018).

Because we conclude that expert testimony was not necessary in the present case, we need not address the second certified question.

establish the standard of care in this negligence action.
We conclude that, under the facts of the present case,
expert testimony was not necessary. Accordingly, we
reverse the Appellate Court's judgment and remand the
case to that court for consideration of the remaining
issues on appeal.

The opinion of the Appellate Court, as supplemented
by the record, sets forth the following facts and proce-
dural history. "On April 25, 2012, the child was an ele-
mentary school student when she was assaulted by
other students while they were on the playground dur-
ing the lunchtime recess. As a result of the assault, the
child sustained a cut to her face that required sutures
. . . and [that] resulted in scarring. The plaintiffs com-
menced the present action against the city [and] the
board, [among others]." *Osborn* v. *Waterbury*, 181
Conn. App. 239, 241–42, 185 A.3d 675 (2018). In their
complaint, the plaintiffs alleged, inter alia, that the
plaintiffs' injuries and damages "were caused by the
negligence and carelessness of the defendant[s] in that
[they] . . . failed to adequately supervise the children
both in and out of the classroom, including the [child]."

"The parties tried the case to the court. Following
the presentation of evidence, the court issued a memo-
randum of decision in which it found that the child was
a fifth grade student at Sprague Elementary School in
Waterbury when she was assaulted by two or more
students on the playground. The playground was sur-
rounded by brick walls and fencing, and, following
lunch, students occupied the area for play and exercise.
More specifically, the child was surrounded by a circle
of students who physically assaulted her and pushed
her into a stone wall, causing injuries to her nose and
cheek with resulting facial scarring. The child experi-
enced posttraumatic headaches for a sustained period
of time, but the most serious effect of this schoolyard

Osborn *v.* Waterbury

assault was its lingering effect on the child's emerging personality and self-image.

"The court also found that Danielle Avalos, a school paraprofessional, was assigned to monitor the students on the playground during recess. She was not provided with written documents that listed her duties during the lunchtime recess. Her two day professional development training occurred prior to the first day of school and focused on the forms of student bullying and the need to distinguish between bullying and students merely 'picking on' other students or otherwise being unkind to them." *Osborn* v. *Waterbury*, supra, 181 Conn. App. 242–43.

The trial court found that "[t]here was also no evidence to suggest that only portions of the student body were released for [lunch] at a given time; it is more likely the student body ate together in the [lunch] room and then went outside for recreation—in large numbers." The trial court further found that, "[a]t the time of the incident, classroom teachers were on [lunch] recess (and there was no evidence to establish that staff lunch times were staggered). The court concludes that 1 student intern and 3 or 4 staff members were not sufficient to exercise control over as many as 400 students [on the playground]."

"With respect to the incident during which the child was injured, the court found that Avalos saw a student repeatedly punch the child in the face and push her into a wall. A precis prepared by the nursing division of the Waterbury Health Department referenced, 'a large, deep cut on the [child's] left cheek' and 'a cut of lesser depth on the bridge of her nose.' " *Osborn* v. *Waterbury*, supra, 181 Conn. App. 243–44. The court rendered judgment in favor of the plaintiffs.

After trial, the defendants sought an articulation from the trial court pursuant to Practice Book §§ 61-10 and

66-5. Specifically, the defendants requested that the trial court articulate ''(1) whether the court found either or both of the individual defendants who remain in the case to be liable for the plaintiffs' injuries and losses, and, if so, on what basis, and (2) whether the court found that the plaintiffs' injuries and losses were caused by the fact, as found by the court, that the number of adults present on the playground where the injuries took place was insufficient to exercise proper control over the number of students present.''

The trial court responded to the defendants' request for articulation as follows:

(1) ''This court did not find any remaining individual (specifically . . . Avalos or Donna Perreault) was liable for the plaintiffs' injuries or losses . . . .

(2) ''This court found [that] the injuries and/or losses were as a result of the [city's] failure to exercise proper control over the number of students present.

(3) ''The court (in [an] August 12, 2016 ruling) found [that] the plaintiffs' injuries were caused by insufficient staffing of personnel to exercise proper control over the number of students on the playground at the time (perhaps as many as 400 students) . . . .

(4) ''The court concluded [that] the injuries to the plaintiffs were proximately caused by an insufficient number of staff personnel—to monitor the actions of students on the playground on the date of injury.'' (Citation omitted; emphasis in original.)

The defendants appealed from the judgment of the trial court to the Appellate Court, claiming that ''the trial court improperly (1) rejected their special defense of governmental immunity for discretionary acts, (2) concluded that the plaintiffs' injuries were caused when an inadequate number of adults were assigned to supervise up to 400 students when there was evidence that

Osborn *v.* Waterbury

there were no more than 50 students on the playground, (3) found in the absence of expert testimony that 1 student intern and 3 or 4 staff members were insufficient to control as many as 400 students on the playground, and (4) awarded damages intended to encourage continued therapy and occupational training for the child in the absence of evidence that she would need such services in the future.'' *Osborn* v. *Waterbury*, supra, 181 Conn. App. 241.

The Appellate Court concluded, ''as a matter of law, that without expert testimony, the court could not properly have found that the defendants breached their duty of care to the child [on the basis that] there was an inadequate number of adults on the playground to supervise the students at the time the child was injured.'' Id. As a result, the Appellate Court reversed the judgment of the trial court and remanded the case with direction to render judgment for the defendants. Id., 247. The Appellate Court did not reach any of the defendants' other claims on appeal. This certified appeal followed.

On appeal to this court, the plaintiffs assert that the Appellate Court incorrectly concluded that, without expert testimony, the trial court could not determine that the defendants breached their duty of care to the child. The defendants respond that the Appellate Court correctly determined that expert testimony was necessary to establish the standard of care. We agree with the plaintiffs that the Appellate Court incorrectly concluded that the trial court could not determine that the defendants breached their duty of care to the child without expert testimony.

Before we begin our analysis, it is important to clarify two points. First, we read the plaintiff's complaint and the trial court's ruling thereon to involve a claim of inadequate supervision. Unlike the defendants and

333 Conn. 816 DECEMBER, 2019 823

Osborn *v.* Waterbury

the Appellate Court, we understand the trial court's response to the request for articulation, namely, that "the injuries and/or losses were as a result of the [city's] failure to exercise proper control over the number of students present," as a conclusion that there was inadequate supervision, not that there was solely an inadequate number of staff on the playground.[3] Such a conclusion is consistent with the well established principle that "we read the record in the light most favorable to sustaining the trial court's judgment." *Weiss* v. *Smulders*, 313 Conn. 227, 232 n.2, 96 A.3d 1175 (2014). As a result, we consider whether expert testimony was required for the plaintiffs' negligence claim of inadequate supervision.[4]

Second, we understand that the linchpin of the Appellate Court's decision is that, because schools are highly regulated areas, expert testimony was required. We disagree that the fact that a particular area is highly regulated necessarily means that expert testimony is

---

[3] In response to the defendants' request for an articulation, the trial court also stated that "[t]he court concluded [that] the injuries to the plaintiffs were proximately caused by an insufficient number of staff personnel—to monitor the actions of students on the playground on the date of injury." It was this statement on which the Appellate Court based its analysis. Nevertheless, a review of the allegations of the plaintiffs' complaint, the evidence presented at trial, the transcripts of the trial, and a fair reading of the memorandum of decision and articulation in the light most favorable to sustaining the trial court's judgment demonstrate that the issue for the trial court to determine was whether the supervision was adequate, not merely whether the number of staff was sufficient.

[4] The dissent is premised on an interpretation of the trial court record with which we fundamentally disagree. The dissent repeatedly asserts that "the *sole basis* of the trial court's conclusion that the defendants' supervision of the children was negligent was the supervisor to student ratio . . . ." (Emphasis added.) This conclusion ignores the articulation of the trial court that "the injuries and/or losses were as a result of the [city's] failure to exercise proper control over the number of students present." This articulation makes clear that the supervisor to student ratio was not the *sole basis* of the trial court's conclusion that the defendants were negligent but that, regardless of the supervisor to student ratio, the defendants did not exercise proper control over the students.

Osborn *v.* Waterbury

required for claims of negligence arising in that area. Rather, we conclude that, irrespective of the heightened regulations of a particular field, whether expert testimony is required to support a claim of negligence turns on whether the alleged claim of error is within the common knowledge of a layperson.[5]

[5] The dissent seems to agree that the fact that schools are a highly regulated area is not dispositive of whether expert testimony was required for this claim of negligence. Instead, the dissent's conclusion that expert testimony was required in this case is premised on the existence of a board policy regarding a supervisor to student ratio for supervision, about which the principal testified. Specifically, the dissent asserts that "[t]he issue presented in this appeal . . . is whether expert testimony was required to enable the trier of fact to determine that the defendants' supervision of the playground was negligent, *notwithstanding the fact that the supervisor to student ratio complied with or exceeded the goals set forth in the board's policy*." We disagree with the dissent that, on this record, the trial court had to accept that any supervisor to student ratio was established merely because the principal testified that one existed.

The dissent acknowledges that "[t]he written policy . . . was not admitted into evidence, and the court made no finding in that regard." Thus, the principal's testimony is the only evidence of the existence of the policy and what the policy contained; that testimony, of course, was subject to the court's finding it credible. The fact that the court made no finding regarding the policy or what it contained demonstrates to us that the court did not credit the principal's testimony regarding the policy or the ratio. Because the court did not credit the principal's testimony, we conclude that, as matter of fact, no particular supervisor to student ratio was established at trial.

The dissent also "disagree[s] . . . with the majority's suggestion that there was not enough evidence in the record to allow the trial court, as fact finder, to draw the reasonable inference that the policy testified to by the principal was one that was in existence and applicable at the time of the incident." This misconstrues our conclusion. First, it is axiomatic that the trial court was not required to credit the principal's testimony regarding the policy—neither when the policy was established nor what the policy contained. See, e.g., *In re Gabriella A.*, 319 Conn. 775, 798, 127 A.3d 948, 960 (2015) (it is undisputed that "the trial court, as the fact finder, was free to accept or reject portions of [each witness'] testimony"). Indeed, the dissent concedes that the trial court made no findings in this regard.

Second, we agree that there was evidence, *if credited*, for the court to make a finding that the policy testified to by the principal was applicable. However, there is simply nothing in the record to demonstrate that the trial court did credit the principal's testimony. Instead, having had that testimony before it, the trial court did not make a finding regarding the policy or any

Osborn *v.* Waterbury

"As an initial matter, we note that the [trial] court's determination of whether expert testimony was needed to support the plaintiff's claim of negligence against the defendant was a legal determination, and, thus, our review is plenary." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 373, 119 A.3d 462 (2015).

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty. . . . We sometimes refer to the scope of that duty as the requisite standard of care. . . .

"[O]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . . The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. . . . Accordingly, the fact finder must consider whether

ratio it may have contained. Therefore, we will not elevate that testimony to a factual finding regarding the proper supervisor to student ratio when the trial court itself did not do so. Rather, on appeal, "we read the record in the light most favorable to sustaining the trial court's judgment." *Weiss* v. *Smulders*, 313 Conn. 227, 232 n.2, 96 A.3d 1175 (2014). Accordingly, the fact that there was testimony in the record to support a finding that is contrary to the judgment of the trial court is irrelevant.

the defendant knew, or should have known, that the situation at hand would obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken.'' (Citations omitted; internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 123–24, 809 A.2d 505 (2002).

''[E]xpert testimony . . . serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard. . . . Expert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors.'' (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id., 125; see *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 374; see also *Doe* v. *Yale University*, 252 Conn. 641, 686–87, 748 A.2d 834 (2000) (''[w]hether expert testimony was required to support the plaintiff's claim compels us to consider whether the determination of the standard of care requires knowledge that is beyond the experience of [the] fact finder'' [internal quotation marks omitted]). Indeed, this court has often said that ''[t]he trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters.'' *Way* v. *Pavent*, 179 Conn. 377, 380, 426 A.2d 780 (1979); see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 375 (''[j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct'' [internal quotation marks omitted]).

Typical cases in which expert testimony is required are those that ''are akin to allegations of professional

Osborn *v.* Waterbury

negligence or malpractice . . . .'' *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996). Nevertheless, expert testimony is not required for all claims arising from a professional relationship despite the fact that those areas are highly specialized and regulated.

There are two types of cases arising from a professional relationship in which expert testimony is not required. In one type of case, expert testimony is not required because the negligence is so gross as to be clear to a layperson. See *Davis* v. *Margolis*, 215 Conn. 408, 416 n.6, 576 A.2d 489 (1990) (expert testimony is not required in legal malpractice cases ''where there is present such an obvious and gross want of care and skill that the neglect is clear even to a layperson'' [internal quotation marks omitted]). In the other type of case, expert testimony is not required because the alleged claim of error involves a task that is within the common knowledge of a layperson. See *Doe* v. *Cochran*, 332 Conn. 325, 337, 210 A.3d 469 (2019) (explaining that expert testimony was not necessary because ''alleged error [was] not one involving professional medical judgment or skill''). The present case falls within the second category.

Indeed, *Badrigian* v. *Elmcrest Psychiatric Institute, Inc.*, 6 Conn. App. 383, 505 A.2d 741 (1986), highlights this second category of cases. The Appellate Court concluded that expert evidence was not necessary in a negligence claim against a psychiatric hospital, when that claim alleged that the hospital failed to supervise its patients, particularly in crossing a state highway. Id., 385. The Appellate Court explained that ''[t]he defendant is attempting to transform this case from one of simple negligence into that of medical malpractice requiring expert medical testimony to prove a medical standard of care and a breach thereof.'' Id., 386. The Appellate Court further explained that ''one need not be guided by medical experts in determining whether

a mentally ill person should be allowed to cross on foot a heavily traveled four lane state highway without supervision. There was no esoteric or uniquely medical issue to be determined under the allegations of [the] case, and the court correctly categorized the negligence charged against the hospital as involving 'no materia medica, nor any complex issue requiring specialized knowledge.' '' Id., 387.

Similarly, in *Cammarota* v. *Guerrera*, 148 Conn. App. 743, 751–52, 87 A.3d 1134, cert. denied, 311 Conn. 944, 90 A.3d 975 (2014), the Appellate Court concluded that expert testimony was not necessary in a case involving a claim of legal malpractice. The claim of legal malpractice centered on the defendant lawyer's act of giving a check payable to his client to another individual, notwithstanding the fact that the defendant had been warned that that individual was untrustworthy. Id., 751 and n.6. The Appellate Court explained that ''[t]he question of whether expert testimony is required is not resolved by characterizing the case as sounding in legal malpractice or ordinary negligence, but rather by determining whether the issue, unaided by expert testimony, is within the realm of a jury's ordinary knowledge. Thus, professional negligence claims do not necessarily require expert testimony, and claims of ordinary negligence may require expert testimony. The appropriate question is whether the issue can be reliably decided by a jury without the assistance of expert testimony.'' Id., 751.

In the present case, the Appellate Court concluded that, ''as a matter of law . . . the standard of care regarding the number of supervisors needed to ensure the safety of elementary school students on a playground is not a matter of common knowledge; far from it. The policies and procedures of our public school system are highly regulated by governing bodies and accreditation organizations. School teachers and

Osborn *v.* Waterbury

administrators are required to be accredited in accordance with educational standards.''[6] *Osborn* v. *Waterbury*, supra, 181 Conn. App. 246. Although we agree with the Appellate Court that the education profession is a highly regulated field, our case law demonstrates the fact that a profession that is highly regulated does not mean that expert testimony is always required in cases alleging negligence against a professional in that field. Instead, whether expert testimony is required in a particular case depends on whether the alleged error is within the common knowledge of a layperson.

In this case, the plaintiffs claimed, inter alia, that their injuries and damages were caused by "the negligence and carelessness" of the defendants in that they "failed to adequately supervise the children both in and out of the classroom, including the [child] . . . ." Therefore, we must determine whether the alleged error here, namely, the supervision of children, involves pro-

_____

[6] It is important to note that, although the principal testified at trial that the board had a "policy" of 1 staff member to 125 students, there was no evidence regarding whether that was a written or verbal policy, whether the policy even existed at the time of the incident four years prior to trial or whether it was adopted in response to the incident. Tellingly, no written policy was ever introduced into evidence.

Furthermore, and perhaps more important, even if the board had adopted a written policy prior to the incident that the school should maintain a ratio of 1 staff member to 125 students, the fact that the school and the board complied with its own policy is not determinative of whether the school was negligent in its supervision of the students in the present case. "This court has stated that, [a]lthough a violation of an employer's work rules can be viewed as evidence of negligence . . . [self-imposed] rules, regulations and policies do not themselves establish the standard of care. . . .The rule is well established and is consistent with the general principle that the standard of care in a negligence action is an objective one, determined by external standards, and not a rule derived from individual practices." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Saint Francis Hospital & Medical Center*, 309 Conn. 146, 279, 72 A.3d 929 (2013) (*Zarella, J.*, dissenting). There was no evidence presented in the present case regarding any regulation or accreditation standard regarding the supervision of students.

fessional judgment or skill, or whether it is a task comparable to those that laypeople routinely perform.

We find this court's recent decision in *Doe* v. *Cochran*, supra, 332 Conn. 325, instructive. In *Doe*, we addressed a claim against a physician for incorrectly reporting the results of a test for sexually transmitted diseases to a patient. Id., 329. In concluding that the plaintiff had alleged a claim of ordinary negligence, we explained that "the alleged error is not one involving professional medical judgment or skill. If the defendant misread [the patient's] lab result, then he failed to perform what was, in essence, a simple, ministerial task. The index to the report states that a result greater than 1.1 indicates a positive test, and the report states that [the patient's] result was 4.43. No advanced medical training was necessary to determine that [the patient] had tested positive for herpes; elementary reading and arithmetic skills should have been sufficient. Indeed, laypeople routinely perform comparable tasks, such as reading and interpreting meat thermometers, oil dipsticks, pool and spa test strips, and insulin tests." Id., 336–37.

This court further explained that, "[o]f course, the same conclusion holds to an even greater extent if the genesis of the error was that the defendant simply told his staff member the wrong test result or the staff member relayed the wrong result to [the patient]. That sort of careless miscommunication could occur in any setting and has nothing to do with the exercise of professional medical judgment or skill." Id., 337. "[R]egardless of whether the alleged error arose from a misreading or a miscommunication, proving that it constituted negligence would not require expert medical testimony or the establishment of a professional standard of care. A jury will not need expert testimony to determine whether the defendant's staff was negligent in leading [the patient] to believe that he was free of [sexually transmitted diseases] when the defendant knew, or

Osborn *v.* Waterbury

should have known, that [the patient] had tested positive for herpes, a contagious [sexually transmitted disease], and intended to engage in sexual activity. Such a determination is well within the ken of a layperson.'' Id.

Like the alleged claim of error in *Doe* v. *Cochran,* supra, 332 Conn. 336–37, the task of supervising children is one that laypeople routinely perform. It was not an issue that required scientific or specialized knowledge. To the contrary, a determination of adequate supervision of children is common knowledge, based on everyday life. The fact that this incident occurred on a playground during school hours, rather than on the same playground after school hours, does not change the fact finder's ability to determine what constitutes adequate supervision.

Moreover, we disagree with the Appellate Court that the plaintiffs' claim required the fact finder to determine ''the standard of care regarding the number of supervisors needed to ensure the safety of elementary school students on a playground . . . .'' *Osborn* v. *Waterbury,* supra, 181 Conn. App. 246. The fact finder was not asked to determine solely the required ratio of children to staff members; instead, the question confronting the fact finder, based on the allegations in the complaint and the evidence presented at trial, was whether there was adequate supervision of the children involved in this particular incident.[7] Indeed, even if there had been

_____

[7] In their complaint, the plaintiffs alleged, inter alia, that their ''injuries and damages were caused by the negligence and carelessness of the defendant[s] in that [they] . . . failed to adequately supervise the children both in and out of the classroom including the [child] . . . .''

At trial, the plaintiffs' counsel explained as follows: ''A couple of things we know: even though [Avalos is] on recess duty . . . [s]he wasn't there during recess, at least part of it, the part where my client got injured. Also, there was another person who was supposed to be on duty; her name was Marlene. She was not on the playground as her recess duty schedule required, while my client was being assaulted. What we know is they looked out a window inside the building, at least one of them, and at that point in time . . . Avalos sees something happening. She then runs through the cafeteria carrying two walkie-talkies. She gives one to Marlene, goes outside, and

Osborn *v.* Waterbury

expert testimony regarding the desired ratio of staff to children and the facts demonstrated that the school met that ratio, the fact finder still may have determined that the supervision was not adequate because adequacy is not based just on numbers, and nothing in the complaint limited the plaintiffs' claim to a mere numerical calculation between the number of students and the number of adults. This was an inadequate supervision case.[8]

---

starts running toward some people. Supposedly, Marlene is in back of her; this is what she says.''

[8] The following colloquy between the trial court and the defendants' counsel demonstrates that the issue before the trial court was whether the supervision on the playground was adequate, not merely whether the number of supervisors on the playground was adequate:

"The Court: Well, let me ask you another question, Counsel . . . . Do you claim that, at the time the injury was inflicted upon the [child], there was anybody providing supervision and guidance on the playground?

"[The Defendants' Counsel]: Yes.

"The Court: Who?

"[The Defendants' Counsel]: The paraprofessional . . . Avalos, was at the door, as well as—

"The Court: What door? What door?

"[The Defendants' Counsel]: The door from the cafeteria leading to—

"The Court: That's not where the injury occurred.

"[The Defendants' Counsel]: Well, the injury occurred on the playground.

"The Court: Well, yeah, I mean that's like saying, you know, I live in—

"[The Defendants' Counsel]: Well then, no, Your Honor, then no one was at the exact scene where this incident occurred.

"The Court: Okay.

"[The Defendants' Counsel]: But for—

"The Court: And there was nobody on the playground at the time.

"[The Defendants' Counsel]: Well, no, I disagree with that, as well. There is—

"The Court: Well, then tell me who they are so that I can correct that misimpression.

"[The Defendants' Counsel]: The gym teacher and—is Ms. Thompson, I think; and then Ms. Yago (phonetic), who—the health teacher, I believe. There were two—One was playing kickball and one was walking around. That was—

"The Court: But nobody—nobody was there for the purpose of supervising the students at—on the playground.

"[The Defendants' Counsel]: The purpose of those individuals being on the playground is to supervise, as well as to interact with students.

Osborn *v.* Waterbury

The trial court found that "[a] large group of students surrounded [the child]. They threw stones at her—most of which were aimed at her face. . . . It was . . . Avalos' testimony that she saw a student repeatedly punch the [child] in the face and push her into a wall." The trial court further found that, "[a]t the time of the incident, classroom teachers were on [lunch] recess (and there was no evidence to establish that staff lunch times were staggered)." Furthermore, the evidence in the present case demonstrated that the paraprofessionals who broke up the incident and attended to the child after the child was hurt had to run from *inside* the building to address the situation.

Specifically, Avalos testified that she was assigned to supervise students on the playground during recess but that she was inside the school building when she saw the incident and had to run outside to stop the incident. Although Avalos testified at trial that she saw other teachers on the playground when she arrived at the scene of the incident, the defendants did not present any testimony from those staff members or any other staff member who was actually on the playground supervising the children.[9] Furthermore, there was no evidence that any staff member who was allegedly on the playground responded to the incident.[10]

---

"The Court: Oh, so you can supervise and play kickball at the same time, Counsel?

"[The Defendants' Counsel]: I don't know if they were supposed to be playing kickball, per se, but they're on the playground in order to interact [with] and supervise the students."

[9] The trial court commented as follows: "[T]hat's why I come back again to who was out there supervising the children. It doesn't appear clear to me at all from the evidence that was submitted, and you could have put on somebody who would have so testified clearly."

[10] In its memorandum of decision, the trial court explained: "The court concludes that 1 student intern and 3 or 4 staff members were not sufficient to exercise control over as many as 400 students [on the playground]." It is important to note that the trial court did not find that 4 teachers and 1 student intern were on the playground. Indeed, the testimony at trial was not clear on this point. Although Avalos testified at trial that other staff members were on the playground when she arrived outside to break up the

Therefore, the issue in the present case was whether the supervision of the children was adequate when a large group of children was able to gather around the child, throwing stones at her, and with one student repeatedly punching the child in the face and pushing her into a wall. We conclude that the fact finder in the present case did not need to apply scientific or specialized knowledge to determine whether the defendants adequately supervised the children in the present case. Accordingly, we conclude that the Appellate Court improperly reversed the judgment of the trial court on the ground that, without expert testimony, judgment could not be rendered for the plaintiffs.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendants' remaining claims on appeal.

In this opinion PALMER, D'AURIA and ECKER, Js. concurred.

KAHN, J., with whom ROBINSON, C. J., and McDON-ALD, J., join, dissenting. I respectfully disagree with the majority's conclusion that the Appellate Court incorrectly concluded that the number of supervisors necessary to provide adequate supervision on an elementary

incident, contradictory testimony from her deposition was also admitted into evidence. At her deposition, Avalos testified that she did not recall any other staff members being on the playground when she arrived outside to break up the incident. This understanding is bolstered by the fact that, during closing arguments, the trial court remarked as follows: "The court's concern is whether or not there was in fact anyone [on the playground]." The court certainly appeared skeptical of the principal's testimony that four staff members were on the playground. Indeed, as we have mentioned, the court pointed out that it did not hear from any of the people the principal claims were on the playground and, if they were on the playground, that they were adequately supervising the children. In light of these facts, we understand the trial court's conclusion to be that, even if the facts were as favorable to the defendants as the defendants allege, the court's conclusion, based on all of the evidence, was that the supervision was still inadequate.

school playground is not within the field of ordinary knowledge and experience of judges and jurors and, therefore, expert testimony was required. See *Osborn* v. *Waterbury*, 181 Conn. App. 239, 246, 185 A.3d 675 (2018); see also, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 375, 119 A.3d 462 (2015); *LePage* v. *Horne*, 262 Conn. 116, 125, 809 A.2d 505 (2002). The present case demonstrates that the question of what constitutes adequate supervision of children on a school playground is a complex one, not readily resolved by a fact finder without the assistance of expert testimony. Given the procedural and factual background of the present case, I would conclude that the plaintiffs, Tatayana Osborn (child) and Tacarra Smith, were required to introduce expert testimony to establish the applicable standard of care. Therefore, I respectfully dissent.

The unfortunate incident that gave rise to this case has clearly impacted the life of a child. The child, at the time a fifth grade student at a Waterbury public elementary school, was attacked by her peers on the playground at recess, resulting in two lacerations on her face—one of which resulted in a permanent scar—and recurring headaches. Keeping children safe while they are at school is of the utmost importance to cities, boards of education, and schools, and the provision of adequate supervision serves the goals of engaging students and keeping playgrounds safe. Unfortunately, even with the most stringent supervision, fights, bullying, and accidents occur on playgrounds. See, e.g., *Despres* v. *Greenwich Boys & Girls Club Assn.*, *Inc.*, Docket No. CV-97-0155783-S, 1999 WL 487565, *5 (Conn. Super. July 2, 1999) (''[e]ven assuming arguendo that there was one supervisor, supervising only one child, standing directly below her and warning her to use the monkey bars properly by not skipping any bars, it is still possible that the plaintiff could fall off and injure

Osborn *v.* Waterbury

her elbow''). Therefore, when an incident such as this occurs on a playground during recess, the question of adequate supervision turns on whether the school made reasonable efforts to prevent a risk of injury to children on the playground. See *Santopietro* v. *New Haven*, 239 Conn. 207, 228–30, 682 A.2d 106 (1996) (concluding that plaintiff failed to prove, by expert testimony, that softball umpires breached their duty of care to prevent unreasonable risk of injury to spectators).

In the present case, the principal of the elementary school at the time of the incident testified at trial that the defendant Waterbury Board of Education (board) had a supervision policy requiring a minimum of 1 supervisor for every 125 students on the playground.[1]

---

[1] The written policy, however, was not admitted into evidence, and the court made no finding in that regard. The following testimony was given by the principal at trial:

"[The Plaintiff's Counsel]: Okay. Now, as far as you're concerned, did you ever give your paraprofessionals and your staff any training having to do with harassment and bullying?

"[The Witness]: We've had a lot of different things regarding that.

"[The Plaintiff's Counsel]: Okay. And prior to [April], 2012, for that school year, what training did you give them?

"[The Witness]: We had had reviewed the definition of bullying, talked about, you know, being proactive, monitoring, you know, areas of the school, the—where those transition areas are, at recess, at lunch, all the down times, PE, different areas. We had a guidance counsel[or] who spoke with the classes as well, participated in our, you know, staff meetings if it occurred on days that they were in the building.

"[The Plaintiff's Counsel]: And part of that procedure was to have recess monitors out there, so to speak, is that correct, I believe on the recess grounds?

"[The Witness]: Well, they're required out there to begin with. It wasn't added because of—

"[The Plaintiff's Counsel]: And they're required why?

"[The Witness]: For safety and monitoring of all students.

"[The Plaintiff's Counsel]: Okay. And were you the one [who] made this requirement?

"[The Witness]: No, it was from the [board] and, you know, in the handbook for policies and procedures.

"[The Plaintiff's Counsel]: All right. And do you know how many people were required at the recess and who they would be?

"[The Witness]: By the [board], the policy was 1—1 staff to 125 students.''

That testimony was the only evidence presented at trial regarding an appropriate supervisor to student ratio.[2] The trial court found, in its memorandum of decision, that "1 student intern and 3—or 4—staff members were not sufficient to exercise proper control over perhaps as many as 400 students."[3] As found by the trial court, there was a maximum of 400 students and a minimum of 4 supervisors on the playground at the time of the incident, resulting in a supervisor to student ratio of 1:100.[4] The trial court concluded that this ratio of supervisors to students was insufficient to satisfy the duty

[2] I agree with the majority that the record on appeal could be clearer as to whether the policy was in effect at the time of the incident. I disagree, however, with the majority's suggestion that there was not enough evidence in the record to allow the trial court, as fact finder, to draw the reasonable inference that the policy testified to by the principal was one that was in existence and applicable at the time of the incident.

[3] On appeal to this court, the parties do not dispute the trial court's findings and, therefore, I do not review the underlying factual basis of this finding. I offer, however, the following observations. The testimony at trial described varying numbers of children on the playground at the time of the incident. The paraprofessional who arrived first to the incident testified that there were no more than fifty students on the playground at the time the fight occurred. The principal testified that there were approximately 400 students *in the entire school* from kindergarten through fifth grade, and that those students ate lunch in 3 waves. The principal further testified that fourth and fifth grade students ate lunch together, there were 3 classes of each grade for a total of 6 classes, and there were about 25 students in each class, totaling 150 students in the lunch wave in question. When the students had finished eating lunch, they left the cafeteria and went to the playground for recess. There was no testimony that conflicted with these statements by the principal and, in fact, the plaintiffs' lawyer in his closing argument before the trial court conceded that there were probably between 90 and 150 students on the playground at the time of the incident. Despite this testimony, the trial court found that the entire school ate lunch and attended recess at the same time. In addition, "perhaps as many as 400 students" is an indeterminate number of students that encompasses everything from a handful of students to 400 students, for which 4 or 5 total supervisors may have been sufficient.

[4] If I consider the maximum number of students and the maximum number of supervisors on the playground at the time of the incident found by the trial court, then there was a supervisor to student ratio of 1:80.

Osborn *v.* Waterbury

of the defendants, the city of Waterbury and the board,[5]
to make reasonable efforts to prevent a risk of injury
to the children on the playground. The trial court's
finding, that there was an inadequate number of supervi-
sors on the playground at the time of the incident, was
the *sole* basis for its conclusion that the defendants
were liable for negligent supervision. By predicating its
conclusion on a ratio that exceeded the only one testi-
fied to at trial—the board's policy of 1:125—the trial
court not only held that supervision was inadequate
under the circumstances of this case, but also implicitly
concluded that the board's policy does not comply with
the applicable standard of care. The issue presented in
this appeal, therefore, is whether expert testimony was
required to enable the trier of fact to determine that
the defendants' supervision of the playground was negli-
gent, notwithstanding the fact that the supervisor to
student ratio complied with or exceeded the goals set
forth in the board's policy.[6]

The trial court's determination of whether expert tes-
timony was required to support the plaintiffs' claim of
negligence against the defendants was a legal deter-
mination subject to plenary review. See, e.g., *Doe* v.
*Hartford Roman Catholic Diocesan Corp.*, supra, 317
Conn. 373. "[E]xpert testimony . . . serves to assist
lay people, such as members of the jury and the pre-
siding judge, to understand the applicable standard of
care and to evaluate the defendant's actions in light of

---

[5] See footnote 1 of the majority opinion for other individuals named as
defendants in the plaintiffs' complaint.

[6] Although rules and policies do not establish the standard of care, under
these circumstances, an expert should have been required to testify as to
the standard of care and whether the board's policy failed to meet that
standard of care. See, e.g., *Van Steensburg* v. *Lawrence & Memorial Hospi-
tals*, 194 Conn. 500, 506, 481 A.2d 750 (1984) ("[W]e point out that hospital
rules, regulations and policies do not themselves establish the standard of
care. . . . The failure to follow such rules and regulations is, however,
evidence of negligence." [Citations omitted.]).

Osborn *v.* Waterbury

that standard. . . . Expert testimony is required when the question involved goes beyond the field of ordinary knowledge and experience of judges or jurors.'' (Citation omitted; internal quotation marks omitted.); *LePage* v. *Horne*, supra, 262 Conn. 125; see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 374; *Doe* v. *Yale University*, 252 Conn. 641, 686–87, 748 A.2d 834 (2000) (''[w]hether expert testimony was required to support the plaintiff's claim compels us to consider whether the determination of the standard of care requires knowledge that is beyond the experience of [the] fact finder'' [internal quotation marks omitted]).

The question of whether expert testimony is required does not turn solely on whether the issue presented is one of ordinary or professional negligence. Expert testimony is most commonly associated with cases that are ''akin to allegations of professional negligence or malpractice,'' such as legal malpractice or medical malpractice. *Santopietro* v. *New Haven*, supra, 239 Conn. 226; see, e.g., *Downs* v. *Trias*, 306 Conn. 81, 88 and n.5, 49 A.3d 180 (2012). Even in professional malpractice actions, however, expert testimony is not required ''where there is present such an obvious and gross want of care and skill that the neglect is clear even to a layperson.'' (Internal quotation marks omitted.) *Davis* v. *Margolis*, 215 Conn. 408, 416 n.6, 576 A.2d 489 (1990). In many cases of ordinary negligence, the issues presented at trial may be matters of common knowledge with which the fact finder has familiarity and, therefore, no expert is needed to testify as to the standard of care and whether the defendant breached that duty. In other cases of ordinary negligence, however, issues related to the standard of care and whether that duty was breached are beyond the ken of the average fact finder and expert testimony is required. Therefore, ''[t]he question of whether expert testimony is required is not resolved by characterizing the case as sounding in [pro-

fessional] malpractice or ordinary negligence, but rather by determining whether the issue, unaided by expert testimony, is within the realm of a jury's ordinary knowledge. Thus, professional negligence claims do not necessarily require expert testimony, and claims of ordinary negligence may require expert testimony. The appropriate question is whether the issue can be reliably decided by a jury without the assistance of expert testimony.'' *Cammarota* v. *Guerrera*, 148 Conn. App. 743, 751, 87 A.3d 1134, cert. denied, 311 Conn. 944, 90 A.3d 975 (2014).

This court's reasoning and holding in *Santopietro* is directly applicable to the present case. See *Santopietro* v. *New Haven*, supra, 239 Conn. 226–27, 229–32. In *Santopietro*, a spectator at a softball game brought a negligence action against the umpires of the game to recover for injuries he suffered when he was struck by a bat thrown by a player. Id., 209. We noted that ''[a]n umpire obtains, through formal training and experience, a familiarity with the rules of the sport, a technical expertise in their application, and an understanding of the likely consequences of officiating decisions. As a result, the umpire possesses knowledge of the standard of care to which an umpire reasonably may be held, and of what constitutes a violation of that standard, that is beyond the experience and ken of the ordinary fact finder.'' Id., 227. Furthermore, we held that the ''fact finder's lack of experience [was] exacerbated by the highly discretionary nature of the umpire's task'' to control the softball game so as to prevent an unreasonable risk of injury to spectators. Id. Thus, the fact finder must determine ''not just whether in hindsight the umpire erred, but also whether the umpire's error constituted an abuse of his broad discretion.'' Id. Relying on these principles, we concluded that the fact finder's decision would require specialized knowledge. The breach of duty, therefore, was required to be proved,

Osborn *v.* Waterbury

in the absence of exceptional circumstances, by expert testimony. Id., 229.

In the present case, the question of whether 4 to 5 supervisors for up to as many as 400 students, as found by the trial court, was sufficient to satisfy the duty owed by the defendants is not within the realm of a fact finder's ordinary knowledge. Although many fact finders may be familiar with the supervision of children, and even the supervision of large numbers of children, that familiarity does not preclude the need for expert testimony when the fact finder would not be familiar with the procedures and considerations of education professionals when determining appropriate supervisor to student ratios. See *Franck* v. *Minisink Valley School District*, 136 App. Div. 2d 588, 588–89, 523 N.Y.S.2d 573 (1988) (when fifth grade student was kicked in head at recess by another student doing cartwheels, court held that, ''[i]n applying the proper standard, familiarity of the jury with cartwheeling should not preclude expert testimony where the jury would not be familiar with accepted professional procedures for supervising cartwheeling''). The need for a board policy setting forth ratios supports the view that the appropriate supervision ratio for an elementary school playground based on the unique circumstances of that setting is not a simple issue with which every adult would be automatically familiar. Instead, expert guidance is necessary to establish the standard of care.

Similar to the umpires' control of a softball game to protect spectators from injury, schools and boards of education develop and apply policies related to the supervision of students at recess based on their formal training and experience, familiarity with applicable rules and statutes, and an understanding of the injuries that may result if they fail to implement sufficient policies. In addition, the decision of how many supervisors is required is complex and highly discretionary

842 DECEMBER, 2019 333 Conn. 816

Osborn *v.* Waterbury

in nature.[7] In arranging for appropriate supervision on playgrounds during recess, consideration should be given to the size and visibility of the playground area, the playground equipment, the age and disability status of the students, and a history of incidents, among other criteria. See generally Alliance of Schools for Cooperative Insurance Programs, Student Supervision Guidelines, p. 3, available at http://ascip.org/wp-content/uploads/2014/05/Student-Supervision-Guidelines.pdf (last visited November 22, 2019). There are no set standards available for appropriate ratios of supervisors to students, and each play area uniquely determines the amount of supervision needed. Id.

I acknowledge that there will be some exceptional circumstances in which expert testimony is not required. See *Santopietro* v. *New Haven*, supra, 239 Conn. 229; see also *David* v. *Margolis*, supra, 215 Conn. 416 n.6 (noting expert testimony is not required, even in professional negligence cases, "where there is present such an obvious and gross want of care and skill that the neglect is clear even to a layperson'' [internal quotation marks omitted]). The present case, however, does not involve such circumstances. The present situation is not one in which the trial court found no supervisors present at recess or found that the supervisors present were engaged in a nonsupervisory activity and clearly not pay-

[7] Our legislature recognized the important role that supervision plays in the prevention of bullying and intervention strategies regarding bullying, and acknowledges that effective strategies may include "adequate adult supervision of outdoor areas, hallways, the lunchroom and other specific areas . . . ." General Statutes § 10-222g. The development of policies by schools and boards that provide for adequate supervision of students to prevent bullying or to promote general safety is a complicated process. In recognition of this complexity, the Department of Education has compiled various resources to provide guidance on the provision of safe playgrounds and made them available through the Connecticut government website. The website includes links to federal resources provided by the United States Departments of Education, Health and Human Services, and Justice as well as other organizations, such as the Peace Education Foundation and Peaceful Playgrounds, which can be consulted when developing individual plans and playgrounds. See Connecticut Department of Education, Bullying and Harassment, available at https://portal.ct.gov/SDE/School-Climate/Bullying-and-Harassment/Related-Resources (last visited November 22, 2019).

Osborn *v.* Waterbury

ing attention (e.g., on their cell phones), which would be an obvious want of care clear even to a layperson. Instead, the trial court's findings establish that there was a supervisor to student ratio of at least 1:100, and there were no additional findings that would suggest that exceptional circumstances demonstrated a gross want of care. Because the standard of care to which a board may reasonably be held in providing adequate supervision and what constitutes a violation of that standard are beyond the ken of the ordinary fact finder, and there are no extraordinary circumstances present that would demonstrate an obvious and gross want of care to the ordinary fact finder, I would hold that expert testimony was required in the present case.

While this court has not had previous occasion to apply the principles of *Santopietro* to the playground supervision context, our trial courts have done so and applied similar reasoning. See, e.g., *Miller* v. *Bridgeport*, Docket No. CV-14-6041193-S, 2017 WL 1333986 (Conn. Super. March 20, 2017), aff'd, 188 Conn. App. 901, 201 A.3d 1160 (2019); *Despres* v. *Greenwich Boys & Girls Club Assn.*, *Inc.*, supra, 1999 WL 487565, *4–5. In *Despres*, a student attending an after-school program claimed that the Greenwich Boys and Girls Club Association, Inc., provided negligent supervision when the student was injured on the playground after falling from the monkey bars. *Despres* v. *Greenwich Boys & Girls Club Assn.*, *Inc.*, supra, *1, 2. At the time, there was ''no written policy for child supervision and no mandatory adult-child ratio,'' but ''the informal policy of the facility was that one supervisor would be responsible for ten to fifteen children depending on the activity.'' Id., *2. The trial court found that, at the time of the incident, there were no more than fifteen children on the playground and one supervisor, which was in compliance with the unwritten policy. Id. The trial court also made explicit findings that the supervisor was ''positioned in a place where she could see the entire playground area and per-

formed the 'seven second scan' which she learned from her experience as a lifeguard . . . and nothing unusual was happening that afternoon . . . .'' Id., *4. In that case, the trial court relied on the reasoning of this court in *Santopietro*, which held that, '' '[i]f the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required.' '' Id., *4 (quoting *Santopietro* v. *New Haven*, supra, 239 Conn. 226). The trial court in *Despres*, finding that a determination of the standard of care of the supervisors of an after-school program and whether that duty was breached was beyond the experience of an ordinary fact finder, concluded that expert testimony was required and that, ''[w]ithout such expert testimony, there [was] no evidence that the defendant provided careless or negligent supervision of the plaintiff.'' *Despres* v. *Greenwich Boys & Girls Club Assn., Inc.*, supra, *5.

In *Miller*, a three year old child attended a program at Skane Center School run by the Bridgeport Board of Education. See *Miller* v. *Bridgeport*, supra, 2017 WL 1333986, *1. Each school day, three or four classes of students participated in recess at the same time and all of the teachers and paraprofessionals from each classroom would supervise the recess. Id., *2. The plaintiff was struck by a tricycle being ridden by another student at recess and suffered injuries; the plaintiff then brought a negligent supervision claim against the defendant Bridgeport Board of Education. Id. The trial court found that ''[t]he evidence before the court fail[ed] to establish that the defendant was negligent as alleged. There was no evidence from any expert witnesses that the defendant's conduct with regard to the amount of supervision that they provided students during recess was inadequate or failed to meet appropriate educational standards for schools such as Skane.'' Id., *3. In concluding that the plaintiffs failed to prove that the defendant was negligent, the trial court specifically

Osborn *v.* Waterbury

found that "there was a lack of expert testimony with regard to the applicable standard of care and whether that duty was breached" as well as "an absence of evidence that the conduct of the defendant and any of its employees violated a school policy or directive . . . [and] [t]he plaintiff did not provide evidence of any rule, policy, or directive requiring the defendant to undertake any specific safety precautions in connection with the activities conducted during recess." Id.

Because, in the present case, the sole basis of the trial court's conclusion that the defendants' supervision of the children was negligent was the supervisor to student ratio, an expert witness should have been required and, without one, the plaintiffs failed to meet their evidentiary burden. I agree with the Appellate Court that "the plaintiffs failed to present expert testimony as to the standard of care related to the number of supervisors needed on an elementary school playground to ensure the safety of the students during recess" and that "[t]he plaintiffs also failed to present expert testimony that the number of staff on the playground supervising the children at the time [of the incident] constituted a breach of the standard of care." *Osborn* v. *Waterbury*, supra, 181 Conn. App. 247. Because these determinations are beyond the knowledge and experience of the ordinary fact finder, the Appellate Court correctly concluded that the trial court erred as a matter of law by not requiring expert testimony.[8]

For these reasons, I respectfully dissent.

_____

[8] The second certified issue was: "Did the plaintiffs receive adequate notice of the need for expert testimony to determine the scope of the duty of care such that a directed judgment was appropriate in this case?" *Osborn* v. *Waterbury*, 329 Conn. 901, 184 A.3d 1214 (2018). It is unclear precisely what the plaintiffs are arguing. The plaintiffs appear to suggest that the defendants' claim in their closing argument before the trial court, that the plaintiffs improperly failed to meet their evidentiary burden in the absence of expert testimony, suggested that the plaintiffs' claim sounded in professional negligence and not ordinary negligence. The plaintiffs then claim on appeal to this court that the defendants were required to provide the plaintiffs with

Osborn *v.* Waterbury

notice that expert testimony was required. I find no merit in the plaintiffs' argument. The plaintiffs rest their argument on the premise that requiring an expert witness transforms the present case from one of ordinary negligence to one of professional malpractice, thereby altering the standard of care. This proposition mischaracterizes the need for expert testimony in negligence claims. The use of an expert witness to support a claim of ordinary negligence case does not transform it into a claim of professional malpractice. As this court has made clear, "professional negligence claims do not necessarily require expert testimony, and claims of ordinary negligence may require expert testimony. The appropriate question is whether the issue can be reliably decided by a jury without the assistance of expert testimony." *Cammarota* v. *Guerrera*, supra, 148 Conn. App. 751. Therefore, even though the plaintiffs' claim sounded in ordinary negligence, an expert could have—and, in the present case, *should* have—been required. In addition, the burden is on the plaintiffs to present sufficient evidence at trial to support their claim of negligent supervision. There is no requirement that the defendants alert the plaintiffs or the court when that burden is not met in order to provide the plaintiffs an opportunity to present more evidence. The plaintiffs were on notice from the time they filed their original complaint that they were required to meet their evidentiary burden that the defendants were negligent in their supervision of students on the playground. Without expert testimony, they failed to do so. For these reasons, I would hold that the defendants were not required to provide notice to the plaintiffs that they failed to meet their evidentiary burden without expert testimony.